# United States Court of Appeals
## For the First Circuit

No. 02-2689

BACOU DALLOZ USA, INC.,

Plaintiff-Appellee,

v.

CONTINENTAL POLYMERS, INC.,

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]
[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Baldock,* Senior Circuit Judge.

Steven E. Snow with whom Michael J. Murray and Partridge Snow & Hahn LLP were on brief for appellant.
John D. Deacon, Jr., with whom Matthew F. Medeiros and Little, Bulman, Medeiros & Whitney, P.C. were on brief for appellees.

September 8, 2003

---

*Of the Tenth Circuit, sitting by designation.

**BALDOCK**, **Senior Circuit Judge**.  In this diversity case arising out of a contract dispute, Defendant-Appellant Continental Polymers, Inc. ("Continental") appeals the district court's order granting summary judgment in favor of Bacou Dalloz USA ("Bacou")on Continental's breach of contract and good faith and fair dealing counterclaims.  Continental also appeals the district court's determination after trial that Continental failed to prove Bacou made fraudulent misrepresentations to induce Continental's owners to sell part of their company to Bacou at a reduced price.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We reverse and remand.

I.

Howard Leight formerly was the sole stockholder and President of Howard S. Leight & Associates, Inc. d/b/a Howard Leight Industries ("HLI").  HLI manufactured hearing protection products, including foam earplugs.  In December 1997, Bacou, an HLI customer, sought to purchase HLI.  After several days of negotiations, Leight declined to sell the company.  Shortly after negotiations fell through, Bacou co-chairman Walter Stepan and in-house counsel Philip Barr called Leight and HLI's CEO John Dean and requested they come to Rhode Island.  Stepan and Barr requested Leight and Dean visit to explain to Bacou's chairman, Philippe Bacou, why Leight did not want to sell HLI.  Leight and Dean agreed to the trip in part because Bacou was one of HLI's biggest customers.

-2-

Leight and Dean flew to Rhode Island and had dinner with Bacou, Stepan, and Barr on Saturday, January 10. During this conversation, Leight informed Bacou he would not sell because the December 1997 offer was $10 million too low. The parties began discussing terms for the sale of HLI, but decided that serious negotiations would be reserved for the next day.

The parties met again on Sunday, January 11. To bridge the $10 million gap, Stepan proposed a $1 million consulting contract for Leight, as well as royalty payments, which would cut the gap in half. The parties then discussed a proposal under which Bacou would purchase all its requirements for polyurethane prepolymer, the main raw material for HLI's foam earplugs, from Howard Leight Enterprises for five years. Howard Leight Enterprises, now Continental, was a newly formed corporation owned by top HLI executives, including Leight and Dean. It was created in October 1997 for the express purpose of manufacturing polyurethane prepolymer. Based on the then-current market price for prepolymer and HLI's volume of prepolymer, this contract would bridge the remaining $5 million price gap. The parties agreed to this arrangement and had a champagne toast.

On January 12th, Stepan and Barr presented to Leight and Dean a letter drafted by Barr and Bacou's outside counsel. The first paragraph of the letter references an asset purchase agreement between Bacou and HLI. Paragraphs three and four discuss

Bacou's agreement to make Leight a Bacou director, as well as various stock options for Leight. The fourth paragraph provides:

> Finally, we understand that you recently formed a new company named Howard Leight Enterprises, Inc. ("HLE"), which will manufacture polyurethane prepolymer, the raw material used in the production of foam ear plugs by Howard S. Leight & Associates, Inc. ("HLI") and currently purchased from Hampshire Chemicals. This will confirm that Bacou USA Safety, Inc. will enter into a supply agreement with HLE pursuant to which Bacou USA Safety, Inc. agrees to purchase its requirements for polyurethane prepolymer from HLE for a period of five years provided that the quality and price of such raw material are equivalent to that which is then used by HLI and available from third-party suppliers.

Stepan, Barr, and Leight signed the letter.

In February, the parties met to sign the closing documents. Continental alleges that at the closing, Dean asked Stepan to incorporate the January 12th letter agreement in the asset purchase contract. Stepan allegedly responded that this was unnecessary because the January 12th letter would stand on its own and if it did not, then Bacou would not be completing the deal that day. The parties subsequently signed the asset purchase agreement without any further memorialization of a supply agreement.

Following the sale, Continental purchased property in Mexico on which it built a manufacturing plant and machinery needed to manufacture prepolymer. In January 1999, Continental informed Bacou it had completed construction and was prepared to begin shipment to Bacou. Continental and Bacou commenced negotiations

for a supply agreement in February 1999. Thomas Klein, President of Bacou's HLI division, represented Bacou. John Dean represented Continental. The negotiations centered around the four principle issues of price, quality, volume, and confidentiality.

According to Continental, the price of prepolymer remained relatively stable, around $2 per pound both at the time of the January 12th letter and up until February 1999. In October 1998, Bacou requested a price reduction on prepolymer from its then-current supplier, Dow (formerly Hampshire Chemicals). Dow was aware of the January 12th letter between Bacou and Continental. Within days of Dean informing Bacou that Continental was prepared to ship prepolymer, Dow agreed to reduce its prepolymer price to $1.56 per pound. According to Continental, Dow did not offer this price to other customers.

As a result of Dow's offer, Bacou took the position in negotiations with Continental that $1.56 was the price "then available" to Bacou under the January 12th letter. Continental disputed the $1.56 price. According to Continental, Bacou artificially reduced the price by telling Dow that if it could lower the price enough, Continental would not be able to match Dow's offer and Dow would remain Bacou's principal supplier.

The parties also had difficulty agreeing on the quality term. Bacou requested production of specifications and samples of Continental's prepolymer for testing to assure adequate quality.

Continental refused, arguing Bacou was attempting to impose onerous testing and sampling requirements that Bacou did not require from other vendors. The volume of prepolymer which Bacou would purchase from Continental also became a disputed issue between the parties. Bacou wanted to purchase a small percentage of prepolymer from a second source to maintain a backup supplier. Continental insisted Bacou purchase one hundred percent of its requirements from Continental. Finally, Bacou insisted Continental enter into confidentiality agreements. Continental refused.

Based on a breakdown in negotiations between Klein and Dean, Bacou's Barr replaced Klein in negotiations. Barr submitted to Continental an initial purchase order for 10,000 pounds of prepolymer at $2 per pound. The order informed Continental that a portion of this lot would be used for testing and upon qualification the balance would be used in production. The purchase order proposed that after developing a working relationship, executives from both companies could meet to work out a long term supply agreement. Continental did not ship prepolymer to Bacou in response to this purchase order.

The parties thereafter went through a series of negotiations on the price, volume, quality, and confidentiality terms. Bacou sent Continental several draft supply agreements, all of which Continental rejected. As of May 12, however, Bacou apparently believed the only sticking point was the confidentiality

agreements. Barr sent another purchase order to Continental for 10,000 pounds at $2 per pound. The order mentioned that the parties were still working out a confidentiality agreement, but that they would not share confidential information until that was completed. Continental declined to ship any product to Bacou pursuant to this purchase order. Bacou offered Continental one last supply agreement in August 1999, but Continental again refused.

## II.

Based on this series of events, Bacou filed suit in Rhode Island state court seeking a declaratory judgment that Bacou had no obligations under the January 12th letter. Continental removed to federal court based on diversity jurisdiction. Continental counterclaimed that Bacou (1) breached the January 12th agreement; (2) breached its duty of good faith and fair dealing under the January 12th agreement; and (3) falsely misrepresented its intention to enter into a supply agreement with Continental to induce Leight to sell HLI at a reduced price.

Bacou moved for summary judgment. The district court granted Bacou's motion as to the contract claim, holding that under Rhode Island law, the January 12th letter was an unenforceable "agreement to agree."[1] The court also found the January 12th

---

[1]The Hon. Ernest C. Torres, Chief United States District Judge, ruled on the motion for summary judgment. The Hon. Mary M. Lisi, United States District Judge, presided at the trial.

letter was not a binding contract because it did not set out all material terms, and no reasonable criteria existed for supplying the missing terms of quality and price. The district court also concluded that because no enforceable contract existed, Bacou owed no duty of good faith and fair dealing. The district court denied summary judgment as to Continental's fraudulent misrepresentation counterclaim, however, concluding Continental presented sufficient evidence of fraud to proceed to trial.

The district court subsequently held a bench trial on the fraudulent misrepresentation counterclaim. During trial, Continental sought to introduce testimony from ex-Bacou employee Rex Lowery concerning statements made by senior Bacou management that they never intended to enter into a supply agreement with Continental. Upon Bacou's objection, the district court struck the testimony as hearsay.

At the conclusion of trial, the district court entered judgment in Bacou's favor. The district court found Bacou negotiated in good faith, and the only reason the parties did not enter into a supply agreement was because Continental's Dean thwarted negotiations. Continental now appeals, arguing (1) the January 12th letter was an enforceable contract; (2) the court erroneously struck Lowery's evidence as hearsay; and (3) the district court erroneously concluded Bacou's in-house counsel Barr did not violate Rhode Island's Rules of Professional Conduct.

Continental first argues the district court erred by granting summary judgment in favor of Bacou on Continental's breach of contract and good faith and fair dealing counterclaims. In granting summary judgment, the district court made two holdings. First, the court concluded that, under Rhode Island law, an "agreement to agree" is unenforceable. Second, the court concluded the January 12th letter also was unenforceable because it omitted two material terms, price and quality.

We review de novo the district court's grant of summary judgment. Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st Cir. 2002). Summary judgment is appropriate if the pleadings, affidavits, admissions, answers to interrogatories, and other materials, viewed in the light most favorable to the nonmoving party, reveal no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Where, as here, federal jurisdiction is based on diversity, the court applies the substantive law of the forum state. Crellin Tech. Inc. v. Equipmentlease Corp., 18 F.3d 1, 4 (1st Cir. 1994). The parties agree Rhode Island law controls.

A.

The district court concluded the parties did not manifest a present intent to be bound to a supply agreement in the January 12th letter. Rather, the district court held the January 12th

letter was an "agreement to agree" to enter into a supply agreement in the future.  The district court relied on <u>Centerville Builders, Inc.</u> v. <u>Wynne</u>, 683 A.2d 1340 (R.I. 1996), to conclude such agreements are unenforceable under Rhode Island law.

In <u>Centerville Builders</u>, a prospective buyer entered into an agreement with the seller for the sale of a tract of land.  In a document captioned "Offer to Purchase," the buyer deposited $5,000 towards the purchase of the property with a total deposit of five percent of the sale price due upon signing the purchase and sales agreement.  The seller signed the Offer to Purchase after deleting the ninth condition, which would have prohibited the seller from negotiating with any other parties for the sale of the property.  The agreement's sixth provision provided:  "SUBJECT TO SATISFACTORY PURCHASE & SALES AGREEMENT BETWEEN SELLER AND BUYER."

Subsequently, the seller sent the buyer an unsigned purchase-and-sales agreement form.  The buyer signed the agreement and returned it to the seller.  The seller later notified the buyer that the seller wanted to "get more money" for the property and would therefore put the property back on the market.  The buyer filed an action for breach of contract.  The Rhode Island Supreme Court held no enforceable contract existed because there was no mutuality of obligation.  In reaching this conclusion, the Rhode Island Supreme Court stated that-

> [W]hen the promises of the parties depend on
> the occurrence of some future event within the

> unilateral control of the promisors, the
> promises are illusory and the agreement is
> nonbinding. . . . In the instant case, . . .
> their promises were illusory since each party
> reserved the unfettered discretion to thwart
> the purchase and sale by unilaterally invoking
> condition 6 of the offer-to-purchase agreement
> and rejecting any purchase-and-sale agreement
> as "unsatisfactory."
>
> Although it is true that the seller
> displayed an intent to be bound by the offer-
> to-purchase agreement when he signed the
> document and agreed to sell the property
> subject to the conditions specified, the
> inclusion of condition 6 made this an illusory
> promise because its occurrence depended solely
> on the subjective will of either party. . . .
> The seller's deletion (with the buyer's
> consent) of the ninth condition further
> evidenced the lack of mutuality of obligation.
> Because the seller was allowed to negotiate
> with other prospective buyers, the offer to
> purchase amounted to little more than an
> agreement to see if the parties could agree on
> a purchase-and-sale agreement at some point in
> the future. As such, it was not an
> enforceable bilateral contract.

Id. at 1341-42.

We believe the district court read Centerville Builders too broadly in ruling that all agreements to agree are unenforceable in Rhode Island. The Rhode Island Supreme Court's comment that the Offer to Purchase was nothing more than agreement to agree and as such was unenforceable must be viewed in the context in which it was made. The court's main concern was that the parties made illusory promises resulting in a lack of mutuality of obligation.

-11-

The January 12th letter contains no such infirmities. The letter does not condition the parties' obligations on the illusory promise that the future supply agreement be "satisfactory" to either party. The letter set forth reciprocal promises in the form of the supply agreement's material terms. Such promises are sufficient to establish mutuality of obligation. Id. at 1341 (noting that a bilateral contract requires mutuality of obligation which is achieved through the making of reciprocal promises). The actual supply agreement could and likely would contain payment terms, delivery terms, and other similar provisions not contained in the letter. But the fact that the parties were to negotiate these details at a future date does not render illusory the obligation incurred under the January 12th letter. The parties clearly agreed to enter into a supply agreement consistent with the terms outlined in the January 12th letter.[2] As discussed below,

---

[2]While we find the obligations sufficient to form an agreement to agree, we do not hold the January 12th letter was itself the supply agreement. In Continental's original counterclaim, it did not assert that the January 12th letter was itself the supply agreement. Rather, Continental contended it was the third party beneficiary of an agreement to enter into a subsequent supply contract. After the close of discovery and after Bacou filed its motion for summary judgment, Continental moved to amend its counterclaim to assert the January 12th letter was an enforceable supply agreement. The magistrate judge denied the motion to amend as untimely and prejudicial to Bacou. Continental appealed this ruling to the district court, which affirmed the magistrate judge. Continental did not appeal the denial of its motion to amend to this Court.

those terms were not so indefinite as to preclude enforcement of the letter.

### B.

The district court alternatively held the January 12th letter was unenforceable because it lacked sufficiently definite material terms of price and quality. The letter describes the price and quality as follows: "the quality and price of such raw material are equivalent to that which is then used by HLI and available from third-party suppliers." The district court found this terminology too vague to provide a reasonably certain basis for giving an appropriate remedy. See Restatement (Second) of Contracts § 33 (1981) (endorsing the view that where the parties have intended to make a contract and there is a reasonably certain basis for granting a remedy, the court should grant that remedy). The court contended Bacou unilaterally could control the raw material HLI was using at any particular time, thus making its promise illusory.

We disagree with the district court that the price term was too vague to form an enforceable contract. The letter describes the price term as the price then available from third-party suppliers. The price term thus is readily discernible by obtaining quotes from other vendors or other evidence of the prevailing market price. Indeed, Bacou's position in negotiations with Continental was not that the price term in the January 12th

-13-

letter was too vague, but that the then-available price was $1.56 per pound, Dow's last price quote to Bacou. Whether this price was artificially deflated as Continental argues is a matter for the trier of fact. Simply because the parties disagree on the factual issue of what the then-available price actually was does not mean that the price term in the January 12th letter was vague as a matter of law. A term specifying market price or the currently available price provides a sufficiently definite basis to provide a remedy. See The Edward S. Quirk Co., Inc. v. National Labor Relations Bd., 241 F.3d 41, 44 (1st Cir. 2001) ("[I]f a contract for a commodity provided that a price would be 'the current market price' for the good, this might well be a figure precise enough for a court or arbitrator to enforce.").

Likewise, the quality term is not indefinite or illusory. The January 12th letter specifies that the quality must be as good as the prepolymer then used by HLI and available from third party vendors. The comparability to products available from third party vendors creates an objective and reasonably definite measure of quality. And to the extent the district court believed HLI could manipulate their prepolymer needs, under Rhode Island law, "virtually every contract contains an implied covenant of good faith and fair dealing between the parties." Crellin, 18 F.3d at 10. Because Bacou would have a contractual duty to determine in good faith the quality of Continental's product as compared to

-14-

third party vendors, the quality term was not illusory. Consequently, we reverse the district court's grant of summary judgment in favor of Bacou on Continental's contract claim.[3]

IV.

Continental also argues the district court erroneously and prejudicially excluded admissible material evidence during the bench trial on Continental's fraudulent misrepresentation counterclaim. At trial, Continental sought to introduce testimony from Rex Lowery, HLI's former security, safety, and facilities manager, concerning statements made by senior Bacou management that they never intended to enter into a supply agreement with Continental.

Specifically, Lowery testified about comments made to him by HLI President Thomas Klein to the effect that Bacou co-Chairman Walter Stepan told Klein that Stepan never intended to purchase any prepolymer from Continental, that under no circumstances was Klein to buy it, and that he had to source the product elsewhere, regardless of the cost, even if the alternative source was an inferior product. Lowery also testified that HLI Vice President

---

[3]The district court also granted summary judgment in favor of Bacou on Continental's good faith and fair dealing counterclaim, holding that because no enforceable contract existed between the parties, Bacou owed no duty of good faith and fair dealing. See Crellin, 18 F.3d at 10. Because we hold the January 12th letter agreement was an enforceable contract, the district court erred by granting summary judgment in favor of Bacou on the good faith and fair dealing counterclaim.

-15-

Thomas Wagner told Lowery that Stepan instructed Wagner "to source the polymer substance from somewhere other than Mr. Dean, Mr. Leight, and Mr. Hanover's company, no matter what it cost and if it was inferior or not." Finally, Lowery testified that Wagner told him Stepan wanted to put Continental out of business. Upon Bacou's objection, the court struck all of this testimony as hearsay.

We review the district court's evidentiary rulings for an abuse of discretion. Willhauk v. Halpin, 953 F.2d 689, 717 (1st Cir. 1991). Bacou concedes the district court erroneously struck the testimony as hearsay. See Appellee's Resp. Br. at 31 ("Although the stated ground of hearsay may not have been proper ground for exclusion of Lowery's testimony..."). Bacou makes no attempt to rebut Continental's arguments that the statements are admissible as party admissions under Fed. R. Evid. 801(d)(2)(D).[4] On the record before us, and because Bacou does not assert Continental failed to establish the statements were admissions, we

---

[4]Pursuant to Fed. R. Evid. 801(d)(2)(D), a statement is an admission, and thus not hearsay, if it is made by a party's agent concerning matters within the scope of the agency, made during the existence of the agency relationship. Lowery's testimony described statements by Bacou employees concerning Bacou's intentions regarding contractual relations with Continental. These alleged statements were made during the course of the employment relationship. Although some of Lowery's testimony contains multiple levels of hearsay, Fed. R. Evid. 805 permits the introduction of hearsay-within-hearsay if each statement falls within an exception to hearsay.

conclude the district court abused its discretion by excluding Lowery's testimony as inadmissible hearsay.[5]

Having demonstrated the district court erred, Continental also must demonstrate the error was harmful.  Ahern v. Scholz, 85 F.3d 774, 786 (1st Cir. 1996).  "A trial court's error in an evidentiary ruling only rises to the level of harmful error if a party's substantial right is affected."  Id.  To determine whether an error affects the party's substantial rights, "the central question is whether this court can say with fair assurance . . . that the judgment was not substantially swayed by the error. . . . Factors we must consider . . . include both the centrality of the evidence and the prejudicial effect of its exclusion or inclusion . . . ."  Id. (internal citations and quotations omitted).  We weigh these factors in the context of the whole record.  Id.

Bacou argues any error was harmless given the following findings made by district court:

> I find that Bacou did enter into good faith negotiations with [Continental] to develop the supply agreement that the parties had discussed back in January of '98.  I find that there is no agreement in this case because of [Continental]'s refusal to negotiate in good faith.  I further find that

---

[5]Our conclusion does not relieve Continental from its burden on retrial to lay the factual predicate that the statements were made by an agent, concerning a matter within the scope of the agency, made during the agency relationship as required by Rule 801.  Should Continental fail to make the necessary showing, Bacou is free to object that Continental has failed to establish the statements are admissible under Rule 801.

> John Dean bears the responsibility here for the breakdown in negotiations.
>
> . . . . Mr. Dean, in my estimation, is the reason why these parties do not have a supply agreement today.

Bacou contends that, based on these findings, the district court's exclusion of Lowery's testimony is harmless error because even if Bacou made fraudulent misrepresentations, the district court specifically found Dean, not Bacou, proximately caused the injury. Thus, Bacou argues Continental cannot establish the causation element of its fraudulent misrepresentation counterclaim.

We cannot say with fair assurance that the judgment was not substantially swayed by the error. Ahern v. Scholz, 85 F.3d at 786. Lowery's testimony was Continental's only direct evidence of Bacou's alleged fraudulent intent not to enter into a supply agreement as Bacou represented to Continental. Testimony that senior Bacou officials never intended to enter a supply contract with Continental as represented during negotiations and as reflected in the January 12th letter is central to Continental's fraudulent misrepresentation claim. See Kelly v. Tillotson-Pearson, Inc., 840 F. Supp. 935, 940 (D.R.I. 1994) (listing as elements of fraudulent misrepresentation under Rhode Island law that the defendant made a false representation of material fact and that the defendant intended thereby to deceive the plaintiff).

The exclusion of Lowery's testimony also prejudiced Continental. Lowery's testimony, if believed, may have changed the fact finder's view of Bacou's alleged good faith and Dean's motivations. Continental presented circumstantial evidence that Bacou never intended to enter into a supply agreement. For example, Continental presented evidence Bacou negotiated a price reduction with Dow just as Continental's prepolymer plant was coming online. Continental argued Bacou was encouraging Dow to set the price so low Continental could not match it, thereby allowing Bacou to avoid its contract with Continental. Continental also argued Bacou's numerous supply agreement offers constituted a continuous retreat from the January 12th letter's terms. Continental also argued Dean was determined not to let Bacou renege on the January 12th letter and was unwilling to agree to what he believed was an artificially low price.

In sum, Lowery's testimony, the only direct evidence of Bacou's alleged fraud, combined with other circumstantial evidence, may have led a reasonable fact finder to make a different conclusion about which party was acting in good faith, and which party caused the failure to enter into a supply agreement. Because we cannot say with fair assurance the result of the trial was not

substantially swayed by the error, we reverse and remand for a new trial.[6]

V.

For the reasons stated above, we REVERSE the district court's grant of summary judgment in favor of Bacou on Continental's contract counterclaim. We also REVERSE AND REMAND FOR A NEW TRIAL on Continental's fraudulent misrepresentation claim.[7]

---

[6]Bacou also argues the testimony should be stricken under Fed. R. Civ. P. 37 as sanctions for failure to comply with discovery because Continental allegedly withheld Lowery's identity until late in discovery. Whether to impose sanctions, particularly a sanction involving the exclusion of material testimony, is a question for the district court in the first instance. Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1507 (1st Cir. 1989) ("The power to impose sanctions for violations of discovery rules and pretrial orders lies in the district court, not this court."). We are not equipped to make a fact finding about Continental's alleged bad faith and failure to comply with discovery obligations. We decline to uphold the district court's erroneous evidentiary ruling on this basis.

[7]Continental also argues the district court erred by finding that Bacou's in-house counsel, Philip Barr, did not violate Rule 4.2 of the Rhode Island Rules of Professional Conduct. Continental argued below that Barr knew Leight and Dean were represented by counsel at the time Barr contacted them in early 1998 to lure them out to Rhode Island. Barr did not contact Leight and Dean's counsel to request permission to contact Leight and Dean directly. This conduct, Continental argues, violated Rule 4.2 of the Rhode Island Rules of Professional Conduct. Rule 4.2 provides-

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Continental contends Barr's willingness to violate the Rules

of Professional Conduct is evidence of Bacou's fraud and overreaching. The district court rejected this inference at trial. In making its findings of fact, the district court found that during the negotiations, Barr was acting as Stepan's "number two man" and not as Bacou's in-house counsel. The court stated that Barr's involvement in the negotiations was "a red herring" as to the issue of fraud. Counsel's alleged willingness to violate a Rule may be relevant to Bacou's "fraudulent intent and overreaching" as Continental asserts, but the weight to be given this evidence is an issue for the fact finder.