# United States Court of Appeals
## For the First Circuit

No. 14-2112

GABRIEL F. MARTINEZ,

Plaintiff, Appellant,

v.

VICTOR F. PETRENKO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

Benjamin T. King, with whom Douglas, Leonard & Garvey, P.C. was on brief, for appellant.
Martha Van Oot, with whom Jackson Lewis, P.C. was on brief, for appellee.

July 6, 2015

**KAYATTA**, **Circuit Judge**.  To maintain a private action under the Fair Labor Standards Act ("FLSA" or "the Act") for a failure to pay for overtime at the mandated rate, an employee must prove a nexus to interstate commerce sufficient to trigger coverage under the Act.  The employee can prove this nexus by showing that the employee engaged in commerce for the employer within the meaning of the Act, or by showing that the employer has other employees who engaged in commerce within the meaning of the Act and that the employer also generated annual gross sales of not less than $500,000.  In filing this lawsuit asserting an FLSA claim for unpaid overtime, Gabriel Martinez alleged that his employer engaged in commerce within the meaning of the Act and generated annual gross sales of not less than $500,000.  While this allegation served to fend off a motion to dismiss, Martinez was ultimately unable to ferret out any evidence to prove that his employer's sales were high enough to trigger coverage under the Act.

Eventually confronted with a motion for summary judgment based on the fact that his employer's annual gross sales were less than $500,000, Martinez pointed to evidence that he himself engaged in commerce within the meaning of the Act.  Finding that this change in the way Martinez proposed to establish coverage came too late, the district court granted summary judgment against Martinez

on his FLSA claim. For other reasons, the court also granted summary judgment on Martinez's state-law claims. We affirm.

## I. Background

### A. Statutory Background

An employee enjoys the protections of the FLSA's overtime pay requirements only when either the employee individually or the employer's enterprise as a whole is "engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1). The burden is on the employee to prove a sufficient nexus to interstate commerce as an essential element of the claim. See Chao v. Hotel Oasis, Inc., 493 F.3d 26, 32-33 & n.6 (1st Cir. 2007) (holding that coverage is "an element of the claim," and that the defendants' stipulation relieved the plaintiff of her burden to prove it).

FLSA coverage triggered by the business activities of the employer (often called "enterprise coverage") requires a showing that the employer:

> (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume ["AGV"] of sales made or business done is not less than $500,000 . . . .

29 U.S.C. § 203(s)(1)(A); see also 29 C.F.R. § 779.259 (defining "[w]hat is included in annual gross volume").

How one shows that coverage is triggered by the activities of the individual employee (so-called "individual coverage") is less clear. Neither the statute nor our circuit precedent offers any road map. Other circuits have held that the employee must "directly participate" in the movement of persons or things in interstate commerce, but this can be satisfied through regular use of an instrument of interstate commerce, such as by using a telephone to call other states for business purposes. See, e.g., Reagor v. Okmulgee Cnty. Family Res. Ctr., 501 F. App'x 805, 809 (10th Cir. 2012) (internal quotation marks and alterations omitted). What is clear, in any event, is that the facts capable of establishing individual coverage are different from those supporting a theory of enterprise coverage. To establish individual coverage, the employee must present facts showing his own activities. To establish enterprise coverage, the employee instead must present facts showing the activities of other employees, and the employer's sales.

**B. Factual Background**

As this is an appeal from a grant of summary judgment, we recite the facts in the light most favorable to Martinez, the non-movant, and we draw all reasonable inferences in his favor. See Ramos-Santiago v. United Parcel Serv., 524 F.3d 120, 122 (1st Cir. 2008).

- 4 -

Victor Petrenko is an emeritus professor of engineering at Dartmouth College who founded Ice Code LLC,[1] a start-up that commercialized a de-icing technology Petrenko had developed. Petrenko served variously as a board member, board chair, and chief technology officer. Martinez, one of Petrenko's former graduate students, began working in research and development for Ice Code in 2005, and rose to the title of senior manager in 2007. In February 2010, Martinez became chief operating officer pursuant to a written "executive agreement" that promised a $190,000 salary, to be paid in monthly installments.

Because Ice Code was facing significant cash-flow problems, Martinez was never paid in accordance with this agreement. Instead, he intermittently received partial payment of the sums owed. On November 3, 2010, the four-member board (which included Martinez, Petrenko, and Ice Code CEO Roman Zhigalov) unanimously[2] passed a "special resolution" listing the legal, financial, and operational challenges facing the company, and putting Zhigalov on warning that, because he had failed to generate any revenue for the last six months while incurring over $2 million in debt, he faced termination as CEO.

---

[1] The parties in their filings spell Ice Code as both "IceCode" and "Ice Code." For consistency, we use the latter. The company was previously called Ice Engineering LLC.

[2] Zhigalov recused himself.

A few weeks later, in mid- to late November 2010, Martinez approached the board and asked to be paid 10,000 additional equity units of Ice Code because he needed "additional incentive" to keep working for the company. Petrenko balked at Martinez's request for 10,000 equity units and, according to Martinez, told him that 10,000 units were worth more than $2 million. (The number seems to have been derived from the per-unit price set for an attempt to raise private capital that had ended in August 2010.) Nevertheless, the board approved the transfer of units to Martinez, and the deal was formalized through an "equity grant agreement" signed on January 13, 2011, by Zhigalov on behalf of the company. It provided that the units would be released on a quarterly basis over two years, and that as partial consideration for the units, Martinez's job duties under the executive agreement would be amended to add a requirement to work to secure "at least one" investment or licensing/development transaction "such that the [company] is able to return to, and continue its full business operations and activities."

At the time, Ice Code did indeed need more investment or business. According to Martinez, by January 2011, all of the employees except for Martinez had been let go, and the company owed money to suppliers and contractors. Over the next few months, Martinez, Petrenko, and Zhigalov all came to be involved, to varying degrees, in formulating what appear to be at least two

competing plans for escaping Ice Code's liabilities while still marketing the de-icing technology (which was owned by Dartmouth and licensed to Ice Code).  Martinez's preferred approach entailed the continuation of Ice Code as a viable entity.  For purposes of summary judgment, we take as true Martinez's claim that he was unaware that an alternative plan ultimately preferred by Petrenko, "Plan B," called for the formation of an entirely new entity to license the technology from Dartmouth, rendering worthless any equity in Ice Code.

In late April 2011, Petrenko told Martinez and Zhigalov that he would not support or participate in Martinez's preferred plan for escaping Ice Code's debts.  About two weeks later, on May 13, 2011, Martinez sent a letter to Petrenko and Zhigalov indicating that he considered the failure to pay him pursuant to the executive agreement a constructive termination.[3]  He calculated that at the time, the company owed him $172,860.99 in unpaid wages. He also sought the immediate vesting of his 10,000 equity units. He received neither, and through a complicated series of events that need not be recited for purposes of this appeal, Ice Code lost the license to the de-icing technology and, as a practical

---

[3]  Petrenko wrote to respond that there had been no constructive termination, but whether or not there had been is not relevant to this appeal.

matter, ceased to exist. The technology was licensed to a new entity with which Petrenko was involved but Martinez was not.

In August 2012, Martinez brought suit against Ice Code and Petrenko in district court, alleging violations of the overtime provisions of the FLSA, violations of New Hampshire labor laws, breach of contract, wrongful discharge, and intentional misrepresentation. Ice Code was dismissed without prejudice when Martinez failed to file a timely return of service. Petrenko is now the sole defendant.

In support of the FLSA claim, paragraph 57 of the complaint alleges that FLSA coverage was triggered by Ice Code's activities, i.e., "enterprise coverage." The entirety of this allegation is as follows:

> Ice Code was a covered employer within the meaning of the Fair Labor Standards Act for the period running from March 1, 2010, through March 1, 2011. Ice Code, LLC, engaged in interstate commerce. Furthermore, Ice Code's annual gross volume of sales made or business done exceeded $500,000.00 for this time period . . . totaling approximately $719,391.46.

The complaint also alleges that Petrenko individually qualified as Martinez's employer under the FLSA. See 29 U.S.C. § 203(d). Petrenko does not dispute this allegation as it bears on the FLSA claim in this appeal.

Petrenko moved to dismiss the FLSA claim under Federal Rule of Civil Procedure 12(b)(6), arguing that Martinez had failed

- 8 -

to plead sufficient facts to plausibly support the element of FLSA coverage. In particular, he noted that Martinez had alleged that Ice Code had received "revenues and investments" totaling more than $500,000, but argued that investments do not count as "sales made or business done" under the FLSA. See 29 C.F.R. § 779.259. Petrenko also pointed out in his motion that Martinez had "not even attempted to allege that he was a 'covered employee' or that there was individual coverage under the FLSA," let alone alleged facts sufficient to support such a claim.

Martinez filed an objection to the motion to dismiss, stating that the claim "should be allowed to proceed because Mr. Martinez has adequately pled enterprise coverage." For an obvious reason (it was correct), Martinez did not dispute Petrenko's characterization of his complaint as attempting to allege enterprise coverage only. For reasons that are less obvious, indeed inexplicable, he did not at the same time amend his complaint to add a plausible assertion of individual coverage. See Fed. R. Civ. P. 15(a)(1)(B) (allowing a party to amend the pleadings as a matter of course within 21 days after service of a motion under Rule 12(b)). Nor did he thereafter seek leave to amend. See Fed. R. Civ. P. 15(a)(2) (providing that after the time to amend by right has expired but before trial begins, the court should "freely give leave [to amend the pleadings] when justice so requires").

- 9 -

The district court denied Petrenko's motion to dismiss. In a March 2013 scheduling order, the court approved a twelve-month discovery plan setting an April 1, 2013, deadline for amending the pleadings and a summary judgment deadline of March 3, 2014. The parties commenced discovery. Petrenko submitted interrogatories to Martinez, including a question asking Martinez to "[s]tate each and every fact upon which you rely to support your claim that [Ice Code] was a 'covered employer' under the Fair Labor Standards Act." Martinez replied that "Ice Code engaged in interstate commerce," but he offered no facts demonstrating any such engagement. Instead, the only facts Martinez provided in response to that inquiry were a list of Ice Code's gross receipts as reflected in bank statements. Nor did Martinez cite any of his own activities as a basis for asserting coverage.

After fourteen months of litigation and well after the deadline for amending the pleadings had passed, Petrenko in October 2013 moved for summary judgment on the FLSA claim, arguing that Martinez had not established facts sufficient to meet his burden of proving that Ice Code had at least $500,000 in non-investment sales or business to establish enterprise coverage.

Martinez tried to parry the motion on three levels. First, he argued that proof of FLSA coverage was not a required element of his cause of action. Unsurprisingly, the district court rejected this argument. See Chao, 493 F.3d at 33 (describing

coverage as an element of the claim).  Second, Martinez reiterated his argument that Ice Code engaged in commerce and had revenues in excess of $500,000.  The district court rejected this argument because a $295,600 investment by Zhigalov did not qualify as "sales made or business done" as required by the plain language of the statute, 29 U.S.C. § 203(s)(1)(A)(ii), and the remaining revenue sources, even if they counted toward AGV, did not total $500,000. Finally, Martinez submitted an affidavit claiming that he himself engaged in interstate travel and phone calls sufficient to establish individual coverage under the Act.  The district court rejected that last argument because it was "a new and unadvertised theory of individual coverage" not raised in the complaint or in response to the earlier motion to dismiss.

After the district court granted Petrenko's motion for summary judgment on the FLSA claim, Martinez v. Petrenko, No. 12-cv-331-JD, 2014 WL 109073, at *5 (D.N.H. Jan. 13, 2014), Martinez moved for reconsideration, arguing that the language in paragraph 57 of his complaint (quoted above) was broad enough to encompass both individual and enterprise coverage.  The district court disagreed, interpreting paragraph 57 as pleading only enterprise coverage, and denied the motion.

In a separate order, the district court also granted summary judgment for Petrenko on Martinez's various state-law

claims.[4]  With regard to the three of those claims raised on this appeal, Martinez sought to prevail against Petrenko personally for liabilities allegedly incurred by Ice Code (which was no longer a defendant).  Martinez therefore had to demonstrate that New Hampshire's version of the doctrine of piercing the corporate veil allowed him, a company executive and director, to state a claim against another director.  The district court held that Martinez had not demonstrated a triable issue of fact as to the applicability of the veil-piercing doctrine to Martinez's claims.

## II.  Standard of Review

We review a district court's grant of summary judgment de novo.  Litz v. Saint Consulting Grp., Inc., 772 F.3d 1, 3 (1st Cir. 2014).  The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

[4] Petrenko had initially argued that because Martinez's claim under the federal FLSA failed, the court lacked subject-matter jurisdiction over the state-law claims under 28 U.S.C. § 1331. The district court held that there existed complete diversity between the parties (at least once Ice Code was dismissed as a defendant), so the court had jurisdiction under 28 U.S.C. § 1332. Martinez, 2014 WL 109073, at *5-6.

## III.  Analysis

### A.  FLSA  Claim

"The fundamental purpose of our pleadings rules is to protect a defendant's inalienable right to know in advance the nature of the cause of action being asserted against him." Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotation marks omitted).  The complaint must provide this notice not with mere "conclusions," but rather with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

As we said in Manning v. Boston Medical Center Corporation, a complaint must allege facts "sufficient to show an entitlement to relief." 725 F.3d 34, 43 (1st Cir. 2013).  One of the "basic elements" necessary to showing an entitlement to relief under the FLSA is that "the work involved interstate activity." Id.  The complaint must therefore allege facts sufficient to establish that either the plaintiff's work or another employee's work involved interstate commerce within the meaning of the Act. Id.

On appeal, Martinez abandons his attempt to prove enterprise coverage.  He argues, instead, that his complaint's conclusory allegation that "Ice Code was a covered employer" under the FLSA was sufficient to give notice that he might try to prove

individual coverage.  This argument is twice flawed.  First, as we explained in Manning, when we read a complaint, "conclusory allegations that merely parrot the relevant legal standard are disregarded."  Id. at 43.  Second, the only nonconclusory allegations pertinent to establishing FLSA coverage refer to Ice Code's annual sales, and thus point only to enterprise, not individual, coverage.  As such, the complaint gave even less notice than a "merely" conclusory complaint would have given that Martinez's individual activities would provide the grounds upon which coverage depended, because it pointed specifically and exclusively in the other direction.  See Ruiz Rivera, 521 F.3d at 85 ("It simply will not do for a plaintiff to fail to plead with adequate specificity facts to support a . . . claim, all-the-while hoping to play that card if her initial hand is a dud."); see also Calvi v. Knox Cnty., 470 F.3d 422, 431 (1st Cir. 2006) (stating that a plaintiff is "not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment").

Martinez did not file a motion to amend his complaint, so he can hardly complain about being held to his original complaint.  It nevertheless reinforces our conclusion to note that, had he filed such a motion when he first announced his reliance on individual coverage after the deadline for amending the pleadings had passed, it is unlikely that we would have found the denial of

- 14 -

that belated motion to be an abuse of discretion.  See Fed. R. Civ. P. 15(a)(2), 16(b)(4); see Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 16 (1st Cir. 1998) (reviewing denial of motion to amend the pleadings for abuse of discretion).  In Torres-Rios, for example, the complaint alleged a product liability claim through facts establishing that the product was defective because its warnings were inadequate.  Id. at 12-15.  In opposing summary judgment, the plaintiffs then tried to rely on facts said to show that the product was defectively designed, arguing that a design defect theory was implicit in their complaint.  Id. at 15-16.  Affirming the district court's refusal to allow the plaintiffs to rely on the new theory, we observed that such a change after discovery was completed "unquestionably would prejudice defendant, whose focus until that time had been on the adequacy of the warning labels and not on the costs and benefits of the product itself."  Id. at 16.

But, says Martinez, his change did not present a change in a "theory of liability," because he consistently argued that Petrenko was liable for unpaid overtime under the FLSA--all that changed was Martinez's theory of why he should enjoy the FLSA's protections in the first place.  However, the nexus to commerce is an element of the claim, without which there is no entitlement to recovery, and Martinez sought to change entirely the theory establishing a nexus.  A belated change of the facts Martinez would

use to establish that nexus implicates precisely the type of unfair misdirection at issue in cases such as Torres-Rios.

The default rule is that, before trial, the court should "freely give leave" to amend the pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). Once a court sets a deadline for seeking such leave, though, the complaint may be modified "only for good cause." Fed. R. Civ. P. 16(b)(4). "Good cause" does not typically include a change of heart on a litigation strategy. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 327 (1st Cir. 2008) (affirming a magistrate's refusal to amend the pleadings eleven months after a scheduling order deadline had passed because "[t]he explanation for the delay seems to be simply that [the plaintiff] thought that it would prevail . . . without any need to further amend. In that, its calculations were wrong. Nonetheless, [the plaintiff] must be bound by the consequences of its litigation strategy."). Here, we note also that all of the facts upon which Martinez belatedly sought to demonstrate individual coverage were known to him before he filed his complaint.

Our decision in Bacou Dalloz USA, Inc. v. Continental Polymers, Inc., 344 F.3d 22 (1st Cir. 2003), is not to the contrary. In that case, we stated that a district court should consider the full record, including affidavits and interrogatories, when considering a motion for summary judgment.

Id. at 26.  Nothing in that case, though, suggests that a district

court need look for facts in support of a theory that was not even

pleaded.  Such a rule would effectively require all litigants to

engage in discovery based not on what was pleaded but also on what

might have been pleaded.  We reject such a requirement.

**B.  State-Law Claims**

Martinez also appeals the district court's grant of

summary judgment to Petrenko on his state-law claims for unpaid

wages under New Hampshire Revised Statutes Annotated §§ 275:43 and

44, breach of contract, and wrongful discharge.[5]  New Hampshire

law governs these claims in this action grounded on diversity

jurisdiction.  See Hansen v. Sentry Ins. Co., 756 F.3d 53, 57 (1st

Cir. 2014).

Martinez brought these claims against Petrenko

personally under the doctrine of piercing the corporate veil, which

allows a person with a claim against a corporation to recover from

a principal of that corporation when the principal abuses the

corporate form.[6]  See, e.g., Terren v. Butler, 134 N.H. 635, 638-

---

[5] The district court also granted Petrenko summary judgment
on Martinez's intentional misrepresentation claim, holding that
Martinez had not raised an issue of fact as to whether he had
relied on any misrepresentation made by Petrenko.  Martinez did
not appeal the grant of summary judgment on his intentional
misrepresentation claim.

[6] Petrenko concedes that veil-piercing can apply to limited
liability companies (LLCs) under New Hampshire law.  See Mbahaba
v. Morgan, 163 N.H. 561, 568 (2012) (applying the veil-piercing

40 (1991) (affirming the lower court's decision to allow veil-piercing upon a finding that corporate principals "divert[ed] corporate assets to their benefit when substantial notice of claims [against the corporation] were outstanding"). In granting Petrenko's motion for summary judgment, the district court rejected Martinez's veil-piercing theory on two grounds, holding first that veil-piercing is not available to allow one company insider to recover against another; and second, that even if veil-piercing were potentially available, Martinez had not shown an issue of fact as to whether Petrenko had used the LLC form to perpetrate a fraud on him.

Defending the judgment, Petrenko presses the argument that veil-piercing is categorically unavailable to corporate insiders under New Hampshire law. While many states have adopted or come close to adopting such a rule, see 2 F. Hodge O'Neal & Robert B. Thompson, O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 8:18 (rev. 3d ed. 2014) ("[C]ourts rarely permit a corporation to be disregarded for the benefit of its own shareholders."), neither party points us to any New Hampshire case law on point.

---

doctrine to a claim against the principal of an LLC). Because most of the relevant veil-piercing case law involves corporations, in this opinion we use the term "corporate" broadly to include LLCs.

We see no need to decide in this case whether New Hampshire law per se bars an insider like Martinez from successfully piercing the corporate veil to hold another insider liable for the corporation's debts. Rather, the record here allows us to affirm on the district court's alternative ground that Martinez has not made out a case for veil-piercing even if he is not categorically barred from doing so.

We begin by observing that Martinez points to no case from New Hampshire or elsewhere allowing the piercing of the corporate veil for a type of wrongdoing analogous to that alleged here.[7] Under New Hampshire law, corporate owners are not "[o]rdinarily" liable for corporate debts. Mbahaba v. Morgan, 163 N.H. 561, 568 (2012). The common law veil-piercing exception to that rule only arises when "a shareholder suppresses the fact of incorporation, misleads his creditors as to the corporate assets, or otherwise uses the corporate entity to promote injustice or fraud." Druding v. Allen, 122 N.H. 823, 827 (1982); see also Terren, 134 N.H. at 639-40.

---

[7] He relies on Cheney v. Moore, 193 Ga. App. 312, 312 (1989), in which veil-piercing was used to allow a 50% shareholder to recover her start-up capital when her former business partner shut her out of the business and she left the company a month after its incorporation; and Southern California Federal Savings & Loan Association v. United States, 422 F.3d 1319, 1331-32 (Fed. Cir. 2005), where the court rejected a bid by individual shareholders to sue the government for breach of a contract with the corporation.

Martinez obviously knew that Ice Code was a corporation, and that it was Ice Code that employed him. He therefore trains his argument on his claim that Petrenko induced him to continue working for Ice Code by misrepresenting the value of its assets. The alleged misrepresentation is Petrenko's statement (according to Martinez) that the 10,000 units that Ice Code granted to Martinez were worth "[s]omething around $2 million" even though he knew that Ice Code was going to fail. The sequence of events, though, was that during a board meeting, Martinez demanded 10,000 equity units as a condition of continuing to work for Ice Code, and Petrenko balked, stating that Martinez's "request seemed very high because the value of those equity units was very high," i.e., "[s]omething around $2 million."[8] The board, with Petrenko in agreement, nevertheless acceded to Martinez's demand.[9] As thus described by Martinez, his offer to continue working for 10,000

---

[8] In his deposition testimony, Martinez characterized the value as based on the per-unit price of a recent private placement memorandum the board had authorized, and said that the board members shared a general agreement about the units' value.

[9] Although Martinez argues that Petrenko "authorized" the conveyance, the facts do not seem to support this characterization. The record shows the conveyance was discussed by the board in November 2010 and January 2011, and formalized through a January 2011 agreement signed by Zhigalov. Whether Petrenko authorized the conveyance is not relevant to this appeal, however, because even if he did, this authorization does not constitute an abuse of the corporate form for which veil-piercing is available.

units came before Petrenko made any assertion of the units' value, and could not have been induced by any such assertion.

More generally, there is no evidence that Martinez was unaware of Ice Code's precarious circumstances when he sought additional equity. At the time of the alleged fraud, Martinez knew the company faced significant hurdles--indeed, the underpayment of his salary is why he approached the board in November 2010 seeking additional equity as an alternative form of compensation. Moreover, he did so only weeks after he had voted to approve the special board resolution describing the company's dire financial straits. As any investor knows, the value of a company's equity may rise or fall, or it may disappear completely if the company fails. When Martinez agreed to keep working at Ice Code for company equity, he was assuming a risk that the company could fail, and he assumed that risk knowing the company's finances were in poor shape. The equity grant agreement itself confirmed (in rather desperate-sounding terms) that the company was, at best, hobbling along. In short, the LLC veil had nothing to do with impeding Martinez from knowing that which he says he did not know. Nor, finally, does Martinez claim that Petrenko actually misrepresented any facts concerning Ice Code's assets, or removed any assets from the company.

Martinez's response is to point to Petrenko's failure to disclose to Martinez the existence of so-called Plan B. Martinez

knew that Ice Code did not own its core technology, that it owed "[s]everal hundred thousand" dollars to the actual owner (Dartmouth), and that it would lose its license if it did not timely pay Dartmouth what it owed.[10]  However, Martinez says he did not know that (again, according to Martinez) Petrenko had given up on Ice Code, and was working on Plan B to form a new entity to exploit Dartmouth's technology in the event Ice Code's license to the technology expired.

An initial hurdle in the way of this argument is, again, the chronology.  Martinez points to two February 2011 e-mails in which Petrenko described problems with Plan B and indicated he was still trying to pursue "Plan A," (which Petrenko says was a plan to attract new investment to Ice Code); and an April 2011 memo that states that "[t]he effort to reorganize [Ice Code] began in earnest" in January 2011, but suggests that Petrenko and others did not "decide[] to shift to a plan-b" until mid-April.  Nothing in these documents would seem to support Martinez's assertion that Petrenko had decided to pursue Plan B in November 2010 when Martinez signed the equity agreement.

---

[10] Dartmouth imposed a May 1, 2011, deadline for payment of the debt.  It is unclear exactly when it imposed this deadline, but Martinez admits that by March 2011, he and Petrenko had already negotiated "several extensions."

Even if a jury could somehow interpret these documents to support Martinez's claim that Petrenko had decided to pursue Plan B in November 2010,[11] we would see no reason to equate one corporate insider's failure to disclose to another insider his own plans to give up on a corporation with the misuse of the corporate veil, at least where the plans involve no use of the corporate form to conceal the plans and no removal of corporate assets without reasonable consideration. Perhaps such an insider, in appropriate circumstances, may owe a duty of disclosure directly to another insider. Whether that is so we need not decide. Martinez has not appealed the dismissal of his intentional misrepresentation claim and otherwise presses no claim against Petrenko directly, resting instead on his attempt to hold Petrenko vicariously liable for the obligations of Ice Code.

Ultimately, Martinez's argument that the veil should be pierced to correct an injustice fails to address the distinction between use of the corporate form to protect the owner from liability for an injustice perpetrated by the corporation, and an owner's use of the corporate form to promote or perpetrate the injustice. New Hampshire law allows veil-piercing in the case of the latter. See Terren, 134 N.H. at 639. To allow veil-piercing

---

[11] In granting summary judgment to Petrenko on Martinez's intentional misrepresentation claim, the district court held they could not.

- 23 -

in the case of the former, however, would essentially eliminate the ordinary rule that the owner is not legally responsible for the liabilities of the corporation.  New Hampshire case law rejects the notion of such a flimsy veil.  See Druding, 122 N.H. at 827-28 (reversing a lower court's piercing of the veil, even though a closely held corporation had failed to observe certain formalities, "[i]n view of the dearth of evidence that [the corporation's president] used the corporation to promote injustice or fraud"); Village Press, Inc. v. Stephen Edward Co., 120 N.H. 469, 471-72 (1980) (noting that veil-piercing is not allowed simply because a corporation is a "one-man operation" if there is no evidence of a fraudulent conveyance, of suppressing the fact of incorporation, or of misleading the plaintiff about corporate assets); Peter R. Previte, Inc. v. McAllister Florist, Inc., 113 N.H. 579, 582-83 (1973) (holding that creditor of insolvent family business could not recover from defendants personally because there was no evidence defendants had "suppressed the fact of their incorporation or misled the plaintiff as to the corporate assets").[12]

## IV.  Conclusion

For the foregoing reasons, we affirm.

---

[12] Martinez does not allege that Ice Code was an alter ego of Petrenko, nor that Petrenko fraudulently transferred Ice Code assets to himself, his relatives, or an entity he controlled.