Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/05/2018 08:13 AM CDT

ELIZABETH MAYS, AND ALL OTHERS SIMILARLY SITUATED,
APPELLEE, v. MIDNITE DREAMS, INC., DOING BUSINESS
AS SHAKER'S, AND DANIEL ROBINSON, APPELLANTS.

___ N.W.2d ___

Filed July 13, 2018.    No. S-17-674.

1. **Contracts: Statutes: Appeal and Error.** The construction of a contract
   and the meaning of a statute are questions of law which an appellate
   court reviews de novo.
2. **Contracts: Public Policy.** The determination of whether a contract vio-
   lates public policy presents a question of law.
3. **Judgments: Appeal and Error.** An appellate court independently
   reviews questions of law decided by a lower court.
4. **Employer and Employee: Independent Contractor: Master and
   Servant.** Ordinarily, a party's status as an employee or an independent
   contractor is a question of fact. However, where the facts are not in
   dispute and where the inference is clear that there is, or is not, a master
   and servant relationship, the matter is a question of law.
5. **Judgments: Appeal and Error.** In a bench trial of a law action, the
   trial court's factual findings have the effect of a jury verdict, and an
   appellate court will not disturb those findings unless they are clearly
   erroneous.
6. ____: ____. In reviewing a judgment awarded in a bench trial of a law
   action, an appellate court does not reweigh evidence, but considers the
   evidence in the light most favorable to the successful party and resolves
   evidentiary conflicts in favor of the successful party, who is entitled to
   every reasonable inference deducible from the evidence.
7. **Appeal and Error: Words and Phrases.** Plain error exists where there
   is an error, plainly evident from the record but not complained of at
   trial, which prejudicially affects a substantial right of a litigant and is of
   such a nature that to leave it uncorrected would cause a miscarriage of
   justice or result in damage to the integrity, reputation, and fairness of the
   judicial process.

8. **Contracts: Wages.** The policy statement in Neb. Rev. Stat. § 48-1201 (Reissue 2010) precludes parties from avoiding the protections of the Wage and Hour Act, Neb. Rev. Stat. § 48-1201 et seq. (Reissue 2010 & Cum. Supp. 2016), by contractual agreement.

9. **Statutes: Legislature: Public Policy.** It is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy of this state.

10. **Contracts: Public Policy.** A contract which is clearly contrary to public policy is void.

11. **Constitutional Law: Rules of the Supreme Court: Notice: Statutes: Appeal and Error.** Strict compliance with Neb. Ct. R. App. P. § 2-109(E) (rev. 2014) is required in order for an appellate court to consider a challenge to the constitutionality of a statute.

12. **Estoppel.** The doctrine of equitable estoppel is based upon the principle that one who has previously taken a position with reference to a transaction and thereby obtained a benefit from the other party cannot thereafter take an inconsistent position which would result in prejudice to the party who relied on the original position.

13. **Appeal and Error.** On appeal, an appellate court will consider only arguments that were both specifically assigned and specifically argued in the appellate brief.

14. **Employer and Employee: Independent Contractor.** No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following factors must be considered: (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business.

15. ____: ____. The right of control is the chief factor distinguishing an employment relationship from that of an independent contractor.

16. **Federal Acts: Employer and Employee: Wages.** The Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), requires employers subject to its provisions to pay each employee engaged

in commerce or in the production of goods for commerce, or who is employed in an enterprise which is engaged in commerce or in the production of goods for commerce, specified wages for all hours worked, certain of which are to be compensated at overtime rates.

17. **Federal Acts: Employer and Employee: Words and Phrases.** Commerce as used in the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), means interstate commerce.

18. **Federal Acts: Employer and Employee: Proof.** One of the basic elements necessary to showing an entitlement to relief under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), is that the work involved interstate activity.

19. ____: ____: ____. Under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), the burden is on the employee to prove a sufficient nexus to interstate commerce as an essential element of the claim.

20. ____: ____: ____. Without at least some minimal showing as to the parties' relationship to interstate commerce, the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), cannot be said to apply as a matter of law.

21. **Federal Acts: Employer and Employee.** The question whether an employee is engaged in commerce within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), is determined by practical considerations, not by technical conceptions. The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity.

22. ____: ____. Work that is purely local in nature does not meet the requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), but any regular contact with commerce, no matter how small, will result in coverage.

23. ____: ____. For an employee to be "engaged in commerce" under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), the employee must be directly participating in the actual movement of persons or things in interstate commerce by (1) working for an instrumentality of interstate commerce, e.g., transportation or communication industry employees, or (2) by regularly using the instrumentalities of interstate commerce in his or her work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel.

24. **Federal Acts: Employer and Employee: Sales: Proof.** To succeed on a Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016), claim alleging enterprise coverage, an employee must elicit

evidence to prove that his or her employer's sales were high enough to trigger coverage under the act.

25. **Employer and Employee: Wages.** Under Neb. Rev. Stat. § 48-1203(2) (Cum. Supp. 2016), an employee is considered to be a tipped employee if the employer proves the employee received tips sufficient to compensate the employee at a rate greater than or equal to the minimum wage.

26. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

27. **Actions: Employer and Employee: Wages.** The Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. § 48-1228 et seq. (Reissue 2010 & Cum. Supp. 2016), does not grant a cause of action to an employee in a case where no regular payday has been established and he or she has never received payment from his or her employer.

28. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed in part, and in part reversed and remanded with direction.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellants.

Kathleen M. Neary, of Powers Law, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Daugherty, District Judge.

Funke, J.

This appeal concerns an order from the Lancaster County District Court which found that Elizabeth Mays, an exotic dancer with Midnite Dreams, Inc., doing business as Shaker's, was an employee entitled to compensation under the federal Fair Labor Standards Act[1] (FLSA) and the Wage and Hour

---

[1] 29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016).

Act[2] (WHA). The district court then awarded damages and attorney fees and costs under the FLSA and the Nebraska Wage Payment and Collection Act[3] (NWPCA). While the court's ruling that Mays was an employee under the WHA was not clearly erroneous, the court erred in granting Mays relief under the FLSA and the NWPCA. Therefore, we affirm in part, and in part reverse and remand with direction to award damages and attorney fees and costs, calculated consistently with the WHA.

## I. BACKGROUND

Shaker's, a juice bar featuring all-nude dancers, is owned by Midnite Dreams and located near Waverly, Nebraska. Shaker's operates as a "leased" club, meaning it contracts with dancers to lease them the use of its facilities and the dancers receive compensation only from customer tips. Shaker's also directly employs a doorman, wait staff, a bartender, and a disk jockey. Daniel Robinson, one of the appellants, manages Shaker's and is the principal owner and sole corporate officer of Midnite Dreams.

From 2012 to 2014, Mays danced at Shaker's, under two 1-year "Independent Artist Lease Agreements" with Midnite Dreams. Under the agreements, Mays paid a flat nightly fee for the use of Shaker's stage and dressing room, with additional fees for each use of the "VIP" or private rooms. The agreements did not provide that Shaker's would compensate Mays for any service and did not contain any schedule or minimum work requirements. The appellants never provided any compensation to Mays.

While dancing at Shaker's, Mays was informed of over 50 additional "house rules," posted at the facility and orally communicated to the dancers, concerning the dancers' conduct and the use of Shaker's facility. Robinson provided inconsistent

---

[2] Neb. Rev. Stat. § 48-1201 et seq. (Reissue 2010 & Cum. Supp. 2016).

[3] Neb. Rev. Stat. § 48-1228 et seq. (Reissue 2010 & Cum. Supp. 2016).

testimony as to whether these rules were mandatory or merely "suggestions." However, Mays testified that the house rules were enforced by Robinson and his employees and that failure to follow the house rules would result in discipline through belligerent reprimands, impositions of fines, and threats to terminate the agreements, which were terminable at will.

The "house rules" concerned the dancers' shift arrival times; hair, makeup, lotion, and dress requirements for the dancers; the number and order of sets the dancers performed during a shift; the method of payment the dancers could accept from customers; cleaning duties; the price the dancers could charge for private and "VIP" room dances; off-stage dancer conduct; and conduct during onstage performances, specifying clothing items the dancers were expected to remove during certain sets.

Mays prepared a spreadsheet of the dates and hours she performed at Shaker's from various documents and recollections. She also calculated her average compensation from customer tips, after lease fees, while working at Shaker's as $44 per hour.

Mays filed a complaint and an amended complaint against the appellants seeking unpaid wages, liquidated damages, and attorney fees and costs under the FLSA and Nebraska law. Though Mays' amended complaint alleged that the appellants violated the FLSA and Nebraska law, it contained no allegations concerning whether Mays had engaged in commerce or whether Midnite Dreams was an enterprise engaged in commerce.

The court determined Mays was an "employee" entitled to minimum wage compensation under the FLSA and Nebraska law, applying the "ABC test" under § 48-1229(1)(a) through (c) and the 10-factor test under § 48-1202(3). The court concluded that by instituting and enforcing the house rules, the appellants transformed Mays into an employee and themselves into employers. The court also ruled Mays was not estopped from claiming she was an employee.

The court determined Mays was entitled to a full minimum wage rate because, unlike Nebraska Law, the FLSA required specific notice requirements to count a "tip credit" against minimum wage requirements. Further, it ruled the FLSA entitled Mays to overtime compensation and liquidated damages. The court ruled the appellants were jointly and severally liable for $7,586.78 in damages for unpaid wages, $27,945 in attorney fees, and $504.70 in costs. The appellants filed a motion for new trial, which was denied.

The appellants perfected a timely appeal. We moved the case to our docket on our own motion pursuant to our authority to regulate the caseloads of the Nebraska Court of Appeals and this court.[4]

## II. ASSIGNMENTS OF ERROR

The appellants assign, restated and reordered, error to the court for (1) concluding that a written lease agreement between the parties created an employment relationship, (2) applying the FLSA and the WHA policy statements to change the parties' contractual relationship, (3) failing to find Mays was estopped from arguing she was an employee, (4) finding Mays was an employee of the appellants, (5) finding Mays was entitled to minimum wage compensation, (6) failing to conclude Mays was a tipped employee, and (7) awarding excessive and unreasonable attorney fees.

## III. STANDARD OF REVIEW

[1-3] The construction of a contract and the meaning of a statute are questions of law which an appellate court reviews de novo.[5] The determination of whether a contract violates public policy presents a question of law.[6] An appellate

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Supp. 2017).

[5] *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

[6] *Johnson v. Nelson*, 290 Neb. 703, 861 N.W.2d 705 (2015).

court independently reviews questions of law decided by a lower court.[7]

[4] Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.[8]

[5,6] In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, and we will not disturb those findings unless they are clearly erroneous.[9] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[10]

[7] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[11] An appellate court may, at its option, notice plain error.[12]

## IV. ANALYSIS

The appellants' arguments on appeal can be consolidated into the following four issues: (1) Did the court err as a matter

---

[7] *Donut Holdings v. Risberg*, 294 Neb. 861, 885 N.W.2d 670 (2016).

[8] *Williams v. Allstate Indemnity Co.*, 266 Neb. 794, 669 N.W.2d 455 (2003).

[9] *Aksamit Resource Mgmt. v. Nebraska Pub. Power Dist.*, 299 Neb. 114, 907 N.W.2d 301 (2018).

[10] *Elting v. Elting*, 288 Neb. 404, 849 N.W.2d 444 (2014).

[11] *Houser v. American Paving Asphalt*, 299 Neb. 1, 907 N.W.2d 16 (2018).

[12] *In re Robert L. McDowell Revocable Trust*, 296 Neb. 565, 894 N.W.2d 810 (2017).

of law in considering whether Mays was an "employee" when the agreements stated the parties had a lessee/lessor relationship? (2) Did the court err in ruling Mays was an "employee"? (3) Did the court err in ruling Mays was entitled to full minimum wage compensation? (4) Was the amount of attorney fees awarded to Mays excessive and unreasonable?

## 1. MAYS WAS EMPLOYEE ENTITLED
### TO COMPENSATION

### (a) Agreements Neither Waived Protections
### Afforded to Mays by WHA nor
### Estopped Mays From Asserting
### Rights Under WHA

The appellants contend that because of the agreements entered into by the parties, as a matter of law, Mays cannot be considered an employee. They argue that the parties' constitutional right to contract supersedes the policy statement in § 48-1201. This argument, however, relies on a presumption that the WHA permits an employee to forfeit the protections afforded to him or her by the WHA through contract. The appellants fail to cite any authority for their argument that the protections of the WHA may be waived, and we find no basis for such in the WHA.

Section 48-1201 provides:

It is declared to be the policy of this state (1) to establish a minimum wage for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

[8-10] The policy statement in § 48-1201 is precisely why parties may not contract away the protections afforded by the WHA. It is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy

of this state.[13] And a contract which is contrary to public policy is void.[14] Accordingly, the agreements are void to the extent they defined the parties' employment relationship, under § 48-1202(3).

[11] To the extent the appellants challenge the constitutionality of the WHA, we do not reach this argument. Neb. Ct. R. App. P. § 2-109(E) (rev. 2014) requires that a party challenging a statute's constitutionality file and serve notice with the Supreme Court clerk at the time of filing the party's brief. Strict compliance with § 2-109(E) is required in order for an appellate court to consider a challenge to the constitutionality of a statute.[15] A review of the record shows the appellants did not file a notice of a constitutional question with the clerk.

[12] The appellants also contend that because Mays profited from the agreements, she is estopped from claiming relief as an employee. The doctrine of equitable estoppel is based upon the principle that one who has previously taken a position with reference to a transaction and thereby obtained a benefit from the other party cannot thereafter take an inconsistent position which would result in prejudice to the party who relied on the original position.[16] The necessary elements of equitable estoppel are as follows:

"As to party estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of

---

[13] *Bamford v. Bamford, Inc.*, 279 Neb. 259, 777 N.W.2d 573 (2010).

[14] *Id.*

[15] *Cain v. Custer Cty. Bd. of Equal.*, 291 Neb. 730, 868 N.W.2d 334 (2015).

[16] *Williams v. Williams*, 206 Neb. 630, 294 N.W.2d 357 (1980).

knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice."[17]

However, Mays could not have made a false representation or concealment of material facts by entering into the agreements the appellants imposed upon her. In addition, the appellants could not have relied, in good faith, upon the conduct or statements of Mays, because the agreements cannot define the relationship between the parties for the purposes of § 48-1202(3). As a result, Mays cannot be estopped from exercising the rights afforded to her under the WHA.

### (b) Court's Determination Mays Was "Employee" Under § 48-1202(3) Was Not Clearly Erroneous

[13] While the appellants assigned error to the district court's determination that Mays was an "employee," the court made the determination under the three separate acts consisting of the FLSA, the WHA, and the NWPCA. Because the appellants reference only the 10-factor employee test that the court applied to the WHA, we confine our analysis to that determination. On appeal, we will consider only arguments that were both specifically assigned and specifically argued in the appellate brief.[18]

[14] No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following factors must be considered:

(1) the extent of control which, by the agreement, the employer may exercise over the details of the work;
(2) whether the one employed is engaged in a distinct

---

[17] *Id.* at 637, 294 N.W.2d at 362.

[18] *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018).

occupation or business; (3) the type of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business.[19]

The appellants argue 3 of the 10 factors support a finding that Mays would be an independent contractor. Those three factors, which include the method of payment, the parties' belief that they were not creating an agency relationship, and the extent of control they had over the details of the work, each favor a determination Mays was an independent contractor.

While the court did not specifically address the method of payment or the parties understanding of their relationship, both support an independent contractor finding. Nevertheless, these were merely two factors considered in conjunction with the other eight factors.

Ordinarily, a party's status as an employee or an independent contractor is a question of fact.[20] In this matter, there is a factual question regarding what the "house rules" were and whether they were mandatory or were merely suggestions. As a result, we review the court's determination that Mays was an employee as a question of fact. In reviewing the court's factual determinations, we do not reweigh the evidence but consider it in the light most favorable to Mays.

---

[19] *Allstate Indemnity Co., supra* note 8, 266 Neb. at 801, 669 N.W.2d at 461-62.

[20] *Id.*; *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997).

[15] The court's decision strongly relied on a finding that the "house rules" imposed on Mays controlled almost every aspect of her employment. The court correctly noted that the "right of control is the chief factor distinguishing an employment relationship from that of an independent contractor."[21]

As the district court also noted, the appellants were in the business of operating a club which offered fully nude, live entertainment. Mays' work was a vital part of that regular business. In addition, the appellants instituted the "house rules," which significantly controlled the manner in which the dancers performed their work, including the dancers' movement on stage and inside the club, the type of dress worn by the dancers, the dancers' cleaning duties, their schedule of performing, their contact with customers, the rates they charged, the method of payment, their cell phone usage, the types of lotions they used, the music they danced to, and their attendance at mandatory meetings. Further, the appellants meted out penalties for violations of the "house rules," which included monetary fines, relegation to less desirable time slots, and verbal reprimands.

The appellants' argument that they did not control the means and methods of the dancers' performances is not supported by the record, does little to undercut the well-reasoned analysis of the court, and fails to address the existence of the "house rules." In addition, the appellants have provided no basis for finding the court's determination that Mays was an "employee" entitled to a minimum wage, under the WHA, clearly erroneous. Therefore, we find these assignments of error to be without merit.

### (c) Appellants Failed to Properly Raise Issue of Robinson's Personal Liability

The appellants argue in their brief that the evidence clearly shows Midnite Dreams, and not Robinson, was Mays' employer

---

[21] See *Kime, supra* note 20, 252 Neb. at 414, 562 N.W.2d at 711.

and that the court improperly pierced the corporate veil without legal basis to make Robinson personally liable. They provide no support for their implication that an owner of a company may be liable under employment laws for wages only if the corporate veil may be pierced, which the court explicitly rejected in its order on the motion for rehearing. Further, the appellants failed to assign error to the court's determination that Robinson was one of Mays' employers and, therefore, was jointly liable for her wages.

As mentioned above, we will consider only arguments that were both specifically assigned and specifically argued in the appellate brief. The trial court ruled Robinson was an employer based on his direct role at Shaker's, not merely through his role as the owner of Midnite Dreams. Therefore, we do not consider this argument.

## 2. MAYS FAILED TO PROVE
## FLSA APPLIED

[16] The FLSA requires employers subject to its provisions to pay each employee engaged in commerce or in the production of goods for commerce, or who is employed in an enterprise which is engaged in commerce or in the production of goods for commerce, specified wages for all hours worked, certain of which are to be compensated at overtime rates.[22] Any employer who violates these requirements is liable to each employee in the amount of his or her unpaid minimum and overtime wages, an additional equal amount as liquidated damages and reasonable attorney fees and costs.[23]

The trial court found that under the FLSA, the appellants were liable to Mays for minimum wage, without any tip credit; overtime wage compensation; liquidated damages; and attorney fees and costs. The appellants argue the court erred in certain determinations of its liability under the FLSA.

---

[22] *Banks v. Mercy Villa Care Center*, 225 Neb. 751, 407 N.W.2d 793 (1987). See 29 U.S.C. §§ 206 and 207.

[23] See 29 U.S.C. § 216(b).

[17] Nevertheless,

> [t]o recover for minimum-wage or overtime violations
> under the FLSA, a plaintiff-employee must demonstrate
> that either (1) his employer is an "enterprise engaged in
> commerce or in the production of goods for commerce"
> or (2) the plaintiff himself has "engaged in commerce or
> in the production of goods for commerce" in his capacity
> as an employee.[24]

The FLSA defines commerce as meaning "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."[25] In short, commerce, as used in the FLSA, means interstate commerce.[26]

[18-20] Accordingly, "[o]ne of the 'basic elements' necessary to showing an entitlement to relief under the FLSA is that 'the work involved interstate activity.'"[27] "The burden is on the employee to prove a sufficient nexus to interstate commerce as an essential element of the claim."[28] Similarly, we have held that "[w]ithout at least some minimal showing as to the [parties'] relationship to interstate commerce, the [FLSA] cannot be said to apply" as a matter of law.[29]

Neither the parties nor the court addressed this element of Mays' FLSA claims. Therefore, before addressing the merits of the award of unpaid minimum and overtime wages, liquidated damages, and reasonable attorney fees and costs, we consider

---

[24] *Helfand v. W.P.I.P., Inc.*, 165 F. Supp. 3d 392, 396 (D. Md. 2016), citing 29 U.S.C. §§ 206(a) and 207(a)(1). Accord *Martinez v. Petrenko*, 792 F.3d 173 (1st Cir. 2015).

[25] 29 U.S.C. § 203(b).

[26] See *Banks, supra* note 22.

[27] *Martinez, supra* note 24, 792 F.3d at 179.

[28] *Id.* at 175. See, also, e.g., *Sobrinio v. Medical Center Visitor's Lodge, Inc.*, 474 F.3d 828 (5th Cir. 2007), citing *Warren-Bradshaw Co. v. Hall*, 317 U.S. 88, 63 S. Ct. 125, 87 L. Ed. 83 (1942).

[29] *Fisbeck v. Scherbarth, Inc.*, 229 Neb. 453, 469, 428 N.W.2d 141, 151 (1988), citing *Banks, supra* note 22.

whether Mays made a sufficient showing to entitle her the protections of the FLSA as a matter of law.

As a dancer, Mays was not engaged in the production of goods in commerce. Instead, we limit our consideration to whether Mays engaged in commerce or whether Midnite Dreams was an enterprise engaged in commerce. The facts capable of establishing coverage under both of these theories are different. "To establish individual coverage, the employee must present facts showing his own activities. To establish enterprise coverage, the employee instead must present facts showing the activities of other employees, and the employer's sales."[30]

### (a) Evidence Does Not Show Mays Was Engaged in Commerce

[21,22] "The question whether an employee is engaged 'in commerce' within the meaning of the [FLSA] is determined by practical considerations, not by technical conceptions."[31] "'The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity.'"[32] "The [U.S.] Supreme Court has articulated that it is the intent of Congress to regulate only activities constituting interstate commerce, not activities merely affecting commerce."[33] "Work that is purely local

---

[30] *Martinez, supra* note 24, 792 F.3d at 175.

[31] *Mitchell v. Vollmer & Co.*, 349 U.S. 427, 429, 75 S. Ct. 860, 99 L. Ed. 1196 (1955). See, also, e.g., *Wirtz v. Modern Trashmoval, Inc.*, 323 F.2d 451 (4th Cir. 1963).

[32] *Mitchell v. H. B. Zachry Co.*, 362 U.S. 310, 324, 80 S. Ct. 739, 4 L. Ed. 2d 753 (1960). See, also, e.g., *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292 (11th Cir. 2011); *Williams v. Henagan*, 595 F.3d 610 (5th Cir. 2010); *Wirtz, supra* note 31.

[33] *Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006), citing *McLeod v. Threlkeld*, 319 U.S. 491, 63 S. Ct. 1248, 87 L. Ed. 1538 (1943).

in nature does not meet the FLSA's requirements, but '[a]ny regular contact with commerce, no matter how small, will result in coverage.'"[34]

[23] The 11th Circuit Court of Appeals has espoused the following test to determine if an employee is engaged in commerce:

> [F]or an employee to be 'engaged in commerce' under the FLSA, he must be directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.,* transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.,* regular and recurrent use of interstate telephone, telegraph, mails, or travel.[35]

Regarding the first type of interstate employees, courts have further expounded on the actions that qualify as engaging in commerce to include an employee that "either crosses state lines in connection with his employment, handles goods directly moving in the channels of interstate commerce, or directly contributes to the repair or extension of facilities of interstate commerce."[36]

There is also substantial case law considering the limits of this type of interstate employment. The U.S. Supreme Court has stated that "handlers of goods for a wholesaler who moves them interstate on order or to meet the needs of specified customers are in commerce, while those employees who handle goods after acquisition by a merchant for general local disposition are not."[37] Based on this principle, courts have rejected claims that an employee operating a vehicle and purchasing

---

[34] *Henagan, supra* note 32, 595 F.3d at 621. See, also, 29 C.F.R. § 779.109 (2017).

[35] *Thorne, supra* note 33, 448 F.3d at 1266, citing 29 C.F.R. §§ 776.23(d)(2) and 776.24 (2005). See, also, 29 C.F.R. § 779.103 (2017).

[36] *Wirtz, supra* note 31, 323 F.2d at 457, citing *Vollmer & Co., supra* note 31.

[37] *McLeod, supra* note 33, 319 U.S. at 494.

gasoline, both of which were produced out-of-state, was in the stream of commerce.[38]

In *Sobrinio v. Medical Center Visitor's Lodge, Inc.*,[39] an employee of a motel, connected to a large local medical center, worked in roles as a janitor, security guard, and driver for guests. He drove guests on errands to local stores and the medical center, but never drove them to the airport or other transportation centers. While he served many out-of-state guests, the court held he was not engaged in commerce under the FLSA, because his duties were purely local in nature.[40] It distinguished his transportation duties from those of other employees that "engaged in commerce when 'their work was entwined with a *continuous* stream of [interstate] travel.'"[41]

Regarding the second type of interstate employees, there is less agreement among courts on what activities constitute engagement in commerce.

In *Jian Long Li v. Li Qin Zhao*,[42] the U.S. District Court for the Eastern District of New York rejected an argument that using a cell phone "'connecting to phone towers across the United States'" amounted to engaging in commerce. In *Jian Long Li*, the plaintiff used a cell phone to contact customers in the course of making local deliveries for a New York City restaurant. The court ruled "the use of a cellular phone by [the plaintiff], but *not* for communication between states, is strictly an intrastate activity, notwithstanding the fact that it utilizes interstate technology."[43] It reasoned that while using

---

[38] *Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300 (E.D.N.Y. 2014), citing *Josendis, supra* note 32, and *Thorne, supra* note 33.

[39] *Sobrinio, supra* note 28.

[40] *Id.*

[41] *Id.* at 829-30 (emphasis in original).

[42] *Jian Long Li, supra* note 38, 35 F. Supp. 3d at 308.

[43] *Id.* at 309, citing *Junkin v. Emerald Lawn Maint. & Landscaping, Inc.*, No. 04-CV-1537, 2005 WL 2862079 (M.D. Fla. Nov. 1, 2005). See, also, 29 C.F.R. § 779.103.

a cell phone, as well as other intrastate activities, may affect or indirectly relate to interstate commerce, it would be untenable to conclude that such local activities would lead to FLSA coverage without evidence of the communication crossing state lines, because it would be "difficult to imagine anyone, in this modern day and age, who [would not then qualify for FLSA coverage]."[44]

Two unpublished U.S. District Court opinions have addressed what activities of dancers constitute engaging in commerce, *Miller v. Centerfold Entertainment Club, Inc.*[45] and *Foster v. Gold & Silver Private Club, Inc.*[46] In *Miller*, the court rejected arguments that a dancer was engaged in commerce by dancing for out-of-state customers and serving beverages produced in another state, but ruled the dancer's use of music streamed over the Internet, text messages to clients, and self-publication on social media constituted engagement in commerce. In *Foster*, the court ruled broadcasting dances over the Internet was engagement in commerce.

At oral arguments, Mays argued that Robinson's contracting with dancers from outside Nebraska and scheduling them to come to Nebraska and the fact that Mays commuted to Nebraska to dance constituted engagement in interstate commerce. However, the record is devoid of evidence that Robinson communicated with the dancers across state lines by using cell phones or the Internet. In addition, as mentioned above, only Mays' personal activities are relevant to analyzing whether she was an employee engaged in commerce. The U.S. Department of Labor regulations explicitly distinguish an employee's personal actions of commuting to and from the work place, which do not constitute engaging in

---

[44] *Jian Long Li, supra* note 38, 35 F. Supp. 3d at 309.

[45] *Miller v. Centerfold Entertainment Club, Inc.*, No. 6:14-CV-6074, 2017 WL 3425887 (W.D. Ark. Aug. 9, 2017) (unpublished decision).

[46] *Foster v. Gold & Silver Private Club, Inc.*, No. 7:14CV00698, 2015 WL 8489998 (W.D. Va. Dec. 9, 2015) (unpublished decision).

commerce, from an employee's traveling across state lines in the performance of his or her duties, who must do so consistently to be considered engaged in commerce.[47] Further, it has been held that an employer's action of hiring an employee in another state and paying for his travel to the state where his employment activities were located did not amount to that employee's engaging in commerce, because the relocation was unrelated to the employee's actual duties.[48] We decline to expand the scope of the FLSA to cover employees based on actions performed in their personal capacity with no relation to the performance of their employment.

Here, even considering the most liberal standards, the evidence fails to show that Mays engaged in interstate commerce. Even the activities the court in *Jian Long Li* was concerned would bring all employees in the modern era under FLSA coverage are not present.

While Robinson testified dancers were free to accept payment by credit card, Mays stated dancers were strictly forbidden from doing so and there was no evidence Mays had ever accepted credit card payment. The evidence shows out-of-state customers did attend Shaker's but, as stated in *Sobrinio*, purely local interactions with out-of-state individuals is not an interstate activity.[49]

Unlike *Miller*, there was no evidence Mays ever communicated with customers in Nebraska or elsewhere by telephone or promoted herself on social media. Also, while the dancers could request music, Robinson and the disk jockey exclusively handled playing music and it was not established that such music was streamed via the Internet. Therefore, we must

---

[47] 29 C.F.R. § 776.12 (2017). See, also, 1 Les A. Schneider & J. Larry Stine, Wage and Hour Law § 4:3 (2018).

[48] *Oliphant v. Kaser et al., d.b.a. Kaser Construction Co.*, 10 Lab. Cas. (CCH) ¶ 62,928 (Dallas Cty. Dist. Ct., Iowa, No. 16470, Nov. 13, 1945).

[49] See *Sobrinio, supra* note 28.

conclude that as a matter of law, Mays failed to make even a minimal showing she engaged in commerce.

### (b) Evidence Does Not Show
### Midnite Dreams Was Enterprise
### Engaged in Commerce

The FLSA defines an "'[e]nterprise engaged in commerce or in the production of goods for commerce'" as, in relevant part, an enterprise that

> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).[50]

[24] FLSA coverage through enterprise coverage is particularly expansive compared to individual coverage based on the broad definition of how an employee may engage in commerce in § 203(s)(1)(A)(i).[51] Congress, however, curbed this potentially limitless definition by including the revenue threshold in § 203(s)(1)(A)(i).[52] To succeed on a FLSA claim alleging enterprise coverage, an employee must elicit "evidence to prove that his employer's sales were high enough to trigger coverage under the [FLSA]."[53]

We need not consider the scope of activities constituting enterprise coverage here, because there was no evidence

---

[50] 29 U.S.C. § 203(s)(1).

[51] *Helfand, supra* note 24; *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339 (E.D.N.Y. 2015).

[52] *Helfand, supra* note 24.

[53] *Martinez, supra* note 24, 792 F.3d at 175.

adduced or even an allegation concerning the annual gross volume of sales made or business done by Midnite Dreams. Therefore, we must conclude that as a matter of law, Mays failed to make even a minimal showing Midnite Dreams was an enterprise engaged in commerce.

The court's ruling in favor of Mays on her FLSA claims, despite Mays' failure to prove all of the elements of her claims, affected a substantial right of the appellants, and to leave this error uncorrected would amount to a miscarriage of justice. Therefore, we find plain error in the court's ruling that Mays was entitled to compensation, overtime compensation, no tip credit, liquidated damages, and attorney fees and costs under the FLSA.

### 3. Mays Was Tipped Employee

[25] The court did not explicitly rule whether Mays was a tipped employee under Nebraska law. However, unlike the FLSA, § 48-1203(2) does not require any prior notification for an employee to be a tipped employee. Instead, an employer must merely prove the employee received tips sufficient to compensate the employee at a rate greater than or equal to the minimum wage.

Mays' evidence that she was compensated by way of gratuities at an average rate of $44 per hour clearly satisfies this requirement. Therefore, under § 48-1203(2), Mays was entitled to a wage of only $2.13 per hour.

### 4. Mays Was Not Entitled to Relief Under NWPCA

The NWPCA requires that absent an exception, "each employer shall pay all wages due its employees on regular days designated by the employer or agreed upon by the employer and employee."[54] Under the NWPCA, "[a]n employee having a claim for wages which are not paid within thirty days of the

---

[54] § 48-1230(1).

regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court."[55] We have summarized this cause of action as "essentially permit[ing] an employee to sue his or her employer if the employer fails to pay the employee's wages as they become due."[56]

"Wages" are defined as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis."[57] Accordingly, we have stated that "'unpaid wages' means 'wages which are not paid within thirty days of the regular pay day designated or agreed upon.'"[58]

[26] Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[59]

[27] As expressed by the preceding provisions, the plain language of the NWPCA indicates that the act only applies to a situation where a regular payday has been established by an employer unilaterally or with the consent of an employee. An employee is not granted a cause of action in the case where no regular payday has been established and he or she has never received payment from his or her employer. Instead, an employee denied minimum wage compensation for employment that has no regular payday may only proceed to recover under the WHA.[60] Further, "wages," under the NWPCA, is

---

[55] § 48-1231(1).

[56] *Pick v. Norfolk Anesthesia*, 276 Neb. 511, 516, 755 N.W.2d 382, 386 (2008).

[57] § 48-1229(6).

[58] *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 670, 407 N.W.2d 751, 757 (1987).

[59] *Becher v. Becher*, 299 Neb. 206, 908 N.W.2d 12 (2018).

[60] § 48-1206(5).

expressly limited to a situation where the parties have agreed the employer will compensate the employee for performing work under the terms of the agreement.

In this case, the evidence shows Mays never received any compensation from the appellants. Further, the agreements do not contain any provision stating Mays will be paid for performing services as a dancer or cleaner. There is also no evidence the appellants had established a regular payday or that Mays had agreed on a certain date for such payment. While the court determined that the house rules were a condition of employment, that is not sufficient to bring the agreements within the scope of the NWPCA.

Therefore, Mays was not entitled to relief under § 48-1231 of the NWPCA.

While Mays is still entitled to recover minimum wage benefits under the WHA, the court's decision to grant relief under § 48-1231 affected a substantial right of the appellants by making them liable for attorney fees from this appeal and requiring them to defend against the possibility of liability for liquidated damages under § 48-1232. Thus, we find the court's ruling that Mays was entitled to minimum wage compensation and attorney fees and costs under § 48-1231 constitutes plain error.

## 5. Attorney Fees

[28] Because we determine the court erred in awarding attorney fees under the FLSA and the NWPCA, we do not consider the appellants' assignment of error regarding whether the amount of attorney fees the court awarded to Mays was excessive and unreasonable. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[61]

---

[61] *Amend v. Nebraska Pub. Serv. Comm.*, 298 Neb. 617, 905 N.W.2d 551 (2018).

## V. CONCLUSION

We conclude the trial court's determination that Mays was an employee entitled to a minimum wage under the WHA was not clearly erroneous, but Mays was entitled to only the minimum wage amount for tipped employees. The WHA may also entitle Mays to attorney fees and costs. Nevertheless, the court erred in ruling Mays was entitled to relief under the FLSA and the NWPCA. Therefore, we affirm in part, and in part reverse and remand with direction to award damages and attorney fees and costs, calculated consistently with the WHA.

Affirmed in part, and in part reversed
and remanded with direction.