The absence of available documentation describing the relationship between the Plaintiffs and the Technology Defendants and their owners does not overcome the compelling circumstantial evidence that the Plaintiffs have alleged suggesting the existence of an employer-employee relationship. Because the Plaintiffs adequately allege that Synergy, Rivero, ECO IQ, Neilitz, Migo IQ, Kotthoff, and Leese employed them pursuant to the FLSA, this Court denied all motions to dismiss on this ground.
Moreover, the FLSA only applies to employment relationships with a "sufficient nexus to interstate commerce." Martinez v. Petrenko, 792 F.3d 173, 175 (1st Cir. 2015) ; see also 29 U.S.C. § 207(a)(1). A plaintiff can establish this nexus either by showing that they, as an employee, engaged in interstate commerce ("individual coverage") or that their employer has other employees engaging in interstate commerce and has annual gross sales of at least $ 500,000 ("enterprise coverage"). Martinez, 792 F.3d at 174-75.
Cloud IQ, Mojo, Neilitz, Migo IQ, Radar_Apps, Kotthoff, and Leese argue that the Plaintiffs fail plausibly to plead either individual or enterprise coverage. Cloud IQ Mot. 8-18; Migo IQ Mot. 8. The Court rules that the Plaintiffs allege individual coverage and thus does not opine on enterprise coverage.
Because the Plaintiffs fail to meet the pleading standards described in Pruell v. Caritas Christi, 678 F.3d 10, 13-15 (1st Cir. 2012), however, the Court granted Cloud IQ, Mojo, Neilitz, Synergy, and Rivero's motions to dismiss the Plaintiffs' overtime claims arising under the FLSA and its Puerto Rico law counterpart.
A. Employer Liability Under the FLSA
Under the FLSA, an employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The statute further defines the term "employ" to "include[ ] to suffer or permit to work." Id. § 203(g). The Supreme Court has made clear that courts are to interpret this definition expansively, and an employee may have "several simultaneous employers." Donovan, 712 F.2d at 1510-11 (citing Falk v. Brennan, 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973) ). "Joint employers," as such simultaneous employers are called, *349 are "individually and jointly" responsible for "compliance with all of the applicable provisions of the act." 29 C.F.R. § 791.2(a).
Under the FLSA's interpreting regulations, a joint employment relationship exists:
in situations such as: (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.
29 C.F.R. § 791.2(b).[12]
To evaluate joint employer status under the FLSA, the First Circuit employs a four-factor test that attempts to capture the "economic reality," or the degree of an employee's dependence on the alleged employer. See Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998). This test directs courts to consider "whether the alleged employer (1) had the power to hire and fire the employees;[13] (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. (citing Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983) ); see also Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 47 (1st Cir. 2013). Neither the presence of evidence satisfying a single factor nor the absence of evidence satisfying another is dispositive. Baystate, 163 F.3d at 676 ("[I]t is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer.").
The Plaintiffs allege facts suggesting the Technology Defendants[14] were joint employers under the Baystate factors. This Court all but ignores such conclusory *350 statements as the Plaintiffs' allegation that Synergy, ECO IQ, Cloud IQ, Migo IQ, Mojo, and J&W "made statements that they had the power to hire and fire Plaintiffs." Compl. ¶ 140; see Schatz, 669 F.3d at 55. The Court pays more heed, however, to the following specific allegation: "In the January 28, 2018 meeting, Migo IQ and ECO IQ identified various conduct that would get Plaintiffs 'sent home,' including not doing as instructed, self-monitoring and not using the App." Compl. ¶ 141. This allegation supports the claim that at least Migo IQ and ECO IQ had the power to hire and fire the Plaintiffs, satisfying the first Baystate factor.
As for the second Baystate factor, the Plaintiffs have detailed a chain of command in which all of the Technology Defendants cooperated in supervising and controlling the Plaintiffs' work. The Plaintiffs describe that "Synergy received the money and Migo IQ received the job orders from the municipalities. Migo IQ gave those orders to Cloud IQ[, which] acted as the foreman, telling Plaintiffs where to go and what to do each day." Compl. ¶ 136. They further allege that:
Migo IQ issued each Plaintiff an I-phone 8 with [the] App pre-loaded. Plaintiffs were required to clock in and out on the App and .... Migo IQ, Cloud IQ and Synergy all watched the App in action and monitored Plaintiffs work remotely from a room back at the main office, called the "bird house."
Id. ¶ 137.
These allegations (the Plaintiffs make no substantive and specific allegations under Baystate factors three and four) may be sufficient on a motion to dismiss to show that at least Synergy, ECO IQ, Migo IQ, and J&W jointly employed the Plaintiffs. See Blanco v. United Comb & Novelty Corp., Civ. A. No. 13-10829, 2013 WL 5755482, at *3, 2013 U.S. Dist. LEXIS 151475, at *11 (D. Mass. Oct. 22, 2013) (Hillman, J.) (ruling that complaint sufficiently alleged joint employer status under Baystate when it claimed alleged employer "hired, disciplined or terminated the Plaintiffs; set all job classifications for working in the factory; set rates of pay ... ; set shifts; supervised and reviewed the Plaintiffs' work at the factory; and assigned jobs" but claimed nothing about maintenance of employment records); cf. Franco v. Roman's Commercial Cleaning & Prop. Maint., Inc., Civ. A. No. 16-225 WES, 2018 WL 2447790, at *2-5, 2018 U.S. Dist. LEXIS 90532, at *6-10 (D.R.I. May 31, 2018) (holding that complaint insufficiently alleged joint employer status when it did not allege that putative employer had any power over employees' hiring or termination nor that it ever dictated employees' schedule or method of completing tasks).
To supplement its analysis, the Court considers other factors that aid in evaluating joint employment in the context of a sub-contracting relationship. See, e.g., Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 689 (D. Md. 2010) (citing Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003) ) (looking to "various miscellaneous factors" when the standard four factors (the same as in Baystate ) are "inconclusive" in the context of a multi-layer contracting relationship).
In Zheng, the Second Circuit vacated the district court's decision -- which was based on a four-factor test almost identical to that in Baystate -- that a garment manufacturer was not liable under the FLSA for employment violations with respect to garment workers who worked predominantly on the manufacturer's products. See Zheng, 355 F.3d at 63-64. Noting that "[t]he 'economic reality' test ... is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA," the Second *351 Circuit recognized that slavish focus on those four factors is not appropriate when doing so excludes from the FLSA's ambit "outsourcing relationships that lack a substantial economic purpose." See id. at 76.
Noting similarities between the case before it and the facts of Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) -- where the Supreme Court held that a slaughterhouse employed meat boners although a contractor hired, paid, and directly supervised them -- the Second Circuit in Zheng drew on the factors that the Supreme Court considered in Rutherford. Zheng, 355 F.3d at 72. The Second Circuit considered:
(1) whether [the manufacturer's] premises and equipment were used for the plaintiffs' work; (2) whether the [c]ontractor ... had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which the plaintiffs performed a discrete line-job that was integral to [the manufacturer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [manufacturer] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [manufacturer].
Id.
Considering the Baystate factors along with those the Second Circuit emphasized in Zheng, see Franco, 2018 WL 2447790, at *3-5, 2018 U.S. Dist. LEXIS 90532, at *8-13 (supplementing Baystate factors with those in Zheng ), it becomes clear that the Plaintiffs sufficiently have alleged that Synergy, ECO IQ, and Migo IQ are joint employers under the FLSA.
The ownership of the Project's equipment is relevant because it "may support the inference that a putative joint employer has functional control over the plaintiffs' work." See Zheng, 355 F.3d at 72. While the Plaintiffs employed their own and J&W's equipment for the work, Synergy, ECO IQ, and Migo IQ insisted that the equipment display their logos. Compl. ¶ 81. Further, Rivero, the president of Synergy, stated "we bring the equipment ... and we bill directly here ... the equipment is in Puerto Rico, we bring them under contractual business conditions, under Synergy." Id. ¶ 124 (second omission in original). Even "[a]fter J&W Grading was no longer on the clean-up project, principals of Synergy/ECO IQ, Migo IQ, Mojo Transport and Cloud IQ continued to use Plaintiffs' vehicles and equipment." Id. ¶ 143.
J&W recruited the Plaintiffs for work specifically on this Project, id. ¶¶ 59-61, so the Plaintiffs -- as a collective entity -- had only one project. This matters "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." See Zheng, 355 F.3d at 72. This dovetails with the sixth factor in Zheng, exclusive or predominant work for the alleged joint employer, as nothing suggests that the Plaintiffs worked on any project other than the Defendants' Project while in Puerto Rico. Id. at 75.
As FEMA provided the Technology Defendants a contract to assist with hurricane clean-up, Compl. ¶¶ 54-55, 123 ("Synergy was hired to collect 200,000 cubic yards of vegetative material and debris in Ponce"), and J&W and the Plaintiffs were the only entities on the Project with the experience and equipment to perform clean-up work, id. ¶¶ 59-60, the Plaintiffs' work was an integral part of the Technology Defendants' overall business objective. See Zheng, 355 F.3d at 72.
*352 The complaint's opacity regarding the relationship between the Plaintiffs and the Technology Defendants after J&W Grading's departure obscures whether responsibility under the contract could pass "without material changes" from one sub-contractor to another. See id. at 74. Evidence that some of the Plaintiffs continued working for the Technology Defendants after J&W's departure, such as the allegation that "principals of Synergy/ECO IQ, Migo IQ, Mojo Transport and Cloud IQ ... supervised, directed and controlled the work schedules and conditions of employment of all Plaintiffs," Compl. ¶ 142, suggests that work could pass easily from one sub-contractor to another. If so, this implies that -- as in Rutherford -- the "employees [were] tied to [the alleged joint employers] rather than to an ostensible direct employer [such as J&W]." See Zheng, 355 F.3d at 74 (citing Rutherford, 331 U.S. at 725, 730, 67 S.Ct. 1473 ).
An entity's supervision of workers indicates joint employer status "only if it demonstrates effective control over the terms and conditions of the plaintiff's employment." Zheng, 355 F.3d at 75 (citing Rutherford, 331 U.S. at 726, 67 S.Ct. 1473 ). The Plaintiffs allege that the Technology Defendants exerted significant control over them through, for example, the routes that they assigned, see Compl. ¶ 126, and the fact that the "Plaintiffs were required to use the App and submit certain forms to J&W Grading and the Technology Firm Defendants in order to get paid," id. ¶ 133 (emphasis added). These allegations may not amount to "effective control," but they certainly show control that exceeds "supervision with respect to contractual warranties of quality and time of delivery" that is typical of a "legitimate subcontracting arrangement." Zheng, 355 F.3d at 75 (citing Moreau v. Air France, 343 F.3d 1179, 1188 (9th Cir. 2003) ).
The Plaintiffs also plausibly have alleged that Rivero, Kotthoff, and Leese were joint employers pursuant to the FLSA. "[A] corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007) (quoting Donovan, 712 F.2d at 1511 ). The Plaintiffs' allegations that Kotthoff and Leese own and manage Synergy, ECO IQ, Cloud IQ, and Migo IQ (supported by specific allegations that Kotthoff spoke with authority at meetings and reiterated that the companies "were all working under 'one flag,' " Compl. ¶ 138), and that Rivero owns Synergy and ECO IQ, id. ¶¶ 36-37, 123-27, plausibly allege that they are also joint employers pursuant to the FLSA.
In sum, given the sufficiency of the allegations suggesting the FLSA employer liability of Synergy, Rivero, ECO IQ, Neilitz, Migo IQ, Kotthoff, and Leese, the Court denied the motions to dismiss on that ground.
B. Individual Coverage Under the FLSA
Some of the Defendants argue that the Plaintiffs fail to establish a sufficient nexus to interstate commerce for the FLSA to apply. See Cloud IQ Mot. 8-18; Migo IQ Mot. 8.
The FLSA's minimum wage and overtime protections cover "employees engaged in commerce" ("individual coverage") or "employed in an enterprise engaged in commerce or the production of goods for commerce" ("enterprise coverage"). 29 U.S.C. § 206(a) ; see also Tony & Susan Alamo Found. v. Secretary of Labor, 471 U.S. 290, 295 n.8, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (delineating types of FLSA coverage *353 and noting that "enterprise coverage" -- introduced in 1961 -- "substantially broadened the scope of the Act"). The statute defines "commerce" to include "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof," 29 U.S.C. § 203(b), and an "enterprise engaged in commerce or the production of goods for commerce" as one that:
(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $ 500,000 ....
29 U.S.C. § 203(s)(1)(A)(i)-(ii).
The Plaintiffs urge the Court to rule that they are subject to FLSA individual coverage because (1) they crossed state lines to commence their work on the Project, Compl. ¶ 147; (2) residents of other jurisdictions performing disaster relief in Puerto Rico inherently are involved in interstate commerce, id. ¶¶ 147-48; (3) their activities were necessary to reopen instrumentalities to make interstate commerce "free and unbounded," id. ¶ 149; and (4) their activities facilitated interstate travel by individuals and businesses, id. ¶ 150.
Although the First Circuit offers no "road map" as to how employees can show individual coverage, Martinez, 792 F.3d at 175, Department of Labor regulations interpreting the reach of the FLSA's wage and hour provisions are instructive, see 29 C.F.R. § 776.9. In defining the general scope of "in commerce" coverage, these regulations offer the following considerations:
One practical question to be asked is whether, without the particular service, interstate or foreign commerce would be impeded, impaired, or abated; others are whether the service ... makes it possible for existing instrumentalities of commerce to accomplish the movement of such commerce effectively and to free it from burdens or obstructions.
Id.
Cloud IQ, Mojo, and Neilitz point to a Fourth Circuit case for the proposition that transporting refuse is an inherently local activity that cannot be the basis for individual coverage. Cloud IQ Mot. 14-16 (citing Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451 (4th Cir. 1963) ). Many of the elements absent in Modern Trashmoval on which the Fourth Circuit relied to rule that there was no FLSA individual coverage there are, however, present here. See Modern Trashmoval, 323 F.2d at 453, 457 (noting that the "employees [did not] either cross[ ] state lines in connection with [their] employment, handle[ ] goods directly moving in the channels of interstate commerce, or directly contribute[ ] to the repair or extension of facilities of interstate commerce").
The Defendants also fail to mention that three years prior to the Fourth Circuit's opinion in Modern Trashmoval, the First Circuit reached a contrary conclusion on similar facts in Mitchell v. Dooley Bros., Inc., 286 F.2d 40 (1st Cir. 1960). In Mitchell, the First Circuit held that independent contractors engaged in local debris collection from homes, businesses, and government agencies were "engaged in commerce," emphasizing that "the removal of the debris seems as closely related [to the production of goods for commerce] as it does essential." 286 F.2d at 44.
The Plaintiffs point to Maxwell v. G.R.A.C.E. Community Services, where a *354 district court in Texas denied a motion to dismiss overtime claims arising out of disaster relief work after Hurricane Katrina based on the substantial effect of disaster relief on freeing the instrumentalities of, and thereby enabling, interstate commerce. Civ. A. No. H-09-3989, 2011 WL 2565329, *3, 2011 U.S. Dist. LEXIS 69340, *10 (S.D. Tex. June 28, 2011) ("By helping disaster victims locate resources to get back on their feet, Defendants are undoubtedly helping people return to work, restore their businesses, and even to resume interstate travel.").
While clearing the roads in one of the continental United States more directly facilitates interstate travel than the same work on an insular American territory, the Plaintiffs' relief work nonetheless facilitated interstate travel; one can only get to the airport or a port for interstate or foreign travel if the roads are clear of debris. See Compania de Ingenieros y Contratistas, Inc. v. Goldberg, 289 F.2d 78, 80 (1st Cir. 1961) (holding that FLSA covers employees working on construction of public highways in Puerto Rico); see also 29 U.S.C. § 203(c) (defining "state" in the FLSA as "any State of the United States or the District of Columbia or any Territory or possession of the United States"). But cf. United States v. Maldonado-Burgos, 844 F.3d 339, 350-51 (1st Cir. 2016) (holding that Puerto Rico is not a "territory or possession" for purposes of section 2421(a) of title 18 of the United States Code ).[15]
The Court is persuaded that the Plaintiffs adequately have alleged[16] that they engaged in interstate commerce as it is defined in the FLSA by stating that they traveled to Puerto Rico, transported tools and equipment from the continental United States to Puerto Rico, employed those imported tools to clean up debris across the island, and conducted disaster relief efforts in Puerto Rico pursuant to a FEMA contract. See generally Compl. The Court notes that while not all of the Plaintiffs traveled to Puerto Rico for the Project, see, e.g., id. ¶¶ 12, 17, the Plaintiffs allege that they all employed tools that had been transported from the continental United States, and some assisted in unloading that equipment from barges upon its arrival in Puerto Rico, see id. ¶¶ 67, 83, 124, 127, 145-46.
As the Plaintiffs plausibly allege that the Defendants were their employers, as discussed above, and the Plaintiffs plausibly allege individual coverage under the FLSA, each of the Defendants is subject to the FLSA's reach.
C. Alleged Minimum Wage and Retaliation Violations
Because the Plaintiffs plausibly allege violations of the FLSA's wage and retaliation provisions, the Court denied the Technology Defendants' motions to dismiss counts I and III for failure to state a claim. For the same reason, the Court denied the motions to dismiss counts V and VII, Plaintiffs' claims based on corollary provisions in Puerto Rican law.[17] See *355 P.R. Laws Ann. tit. 29, § 250 (applying the FLSA's federal minimum wage and implementing "provisions in federal legislation and regulations" to workers in Puerto Rico); id. § 194a (protecting workers from retaliation by employer in Puerto Rico).
In contesting the sufficiency of the Plaintiffs' wage violation allegations, Cloud IQ, Mojo, Neilitz, and Guthrie point to the absence of specific allegations regarding the daily flat pay rates owed to the Plaintiffs, the specific two weeks for which they were paid, the amount they were paid in the one paycheck they received, an estimated number of unpaid hours, and the overall amount the Plaintiffs were owed. Cloud IQ Mot. 4-5; J&W Mot. 6-7. They liken such gaps to those in Pruell, where the First Circuit affirmed dismissal of an FLSA action where the plaintiffs failed to allege specific estimates for the amount unpaid and hours worked. Cloud IQ Mot. 4-6; J&W Mot. 6-7; Pruell, 678 F.3d at 12-14.
While the Plaintiffs allege in a fairly conclusory manner that they "regularly worked over 8 hours per day and over 40 hours per week," Compl. ¶¶ 153, 160, 177, 184, they provide more detail than the Pruell plaintiffs did and enough to overcome the Defendants' motions. True, the First Circuit in Pruell said that an allegation that plaintiffs "regularly worked hours over 40 in a week and were not compensated" was "one of those borderline phrases," that, "[s]tanding alone," was "little more than a paraphrase of the statute." 678 F.3d at 13. The Plaintiffs' allegation here, however, does not stand alone. The Plaintiffs allege the approximate date of the sole paycheck that they received. Compl. ¶ 87. They point to the rate schedule listed in the Subcontractor Agreement as defining the minimum wages to which they were entitled. Id. ¶ 154. They provide further support for their underpayment allegations by alleging that Guthrie, the president of J&W, sent text messages to the employees stating: "I take responsibility for [the delayed payments] and will. That why [sic] i getting a 3 million dollar loan so I can pay everyone like i said i would." Id. ¶ 90.
There is less great a need for specific numbers to calculate the degree to which they were underpaid than in some other cases because, as the Plaintiffs point out, "no complicated mathematical calculation is needed to determine that Plaintiffs were not paid minimum wage" if they received no payment at all for ten of twelve weeks. Id. ¶ 153. Moreover, some of the considerations counseling leniency in Pruell are also present here. For example, "some of the information needed may be in the control of defendants." Pruell, 678 F.3d at 15.
Because these allegations suffice to state a plausible claim to relief for violation of the minimum wage provisions of the FLSA, and thus also the minimum wage provisions of the Puerto Rican code, the Court denied the motions to dismiss on this ground.
Likewise, the Court denied the motion to dismiss for failure to state a retaliation claim under the FLSA and Puerto Rico law.
To state a retaliation claim under FLSA section 15(a)(3), the Plaintiffs must allege that (1) they "engaged in a statutorily protected activity," and (2) the employer "subjected [them] to an adverse employment action (3) as a reprisal for having engaged in protected activity."
*356 Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004) (citing Blackie v. Maine, 75 F.3d 716, 722 (1st Cir. 1996) ). An employee engages in statutorily protected activity when he or she " 'step[s] outside' a normal role ... based on a reasonable belief that the employer engaged in conduct" that violates the FLSA. Claudio-Gotay, 375 F.3d at 102 (quoting EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998) ). "[T]he assertion of statutory rights is the hallmark of protected activity." Id. (quoting McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996) ).
The Plaintiffs allege that the Defendants terminated them or threatened to terminate them when they sought back pay and the Defendants became aware that the Plaintiffs planned to bring a lawsuit alleging violations of the FLSA. Compl. ¶¶ 94, 167-72. These allegations squarely suffice to state a plausible claim of retaliation.
D. Failure to Plead Overtime Violations
Some of the Defendants argue that the Plaintiffs fail sufficiently to plead overtime violations under the FLSA and Puerto Rican law. Cloud IQ Mot. 4-7; Synergy Mot. 11-12; Rivero Mot. 12-13; see 29 U.S.C. § 207(a)(1) (requiring extra wages for work hours above forty-hour workweek); P.R. Laws Ann. tit. 29, § 271 - 274 (same). The Court agrees that the Plaintiffs' allegations do not meet the Pruell standards for pleading overtime violations, and dismissed count II as to Cloud IQ, Mojo, Neilitz, Synergy, and Rivero and count VII as to Cloud IQ, Mojo, and Synergy on their motions.
To defend the sufficiency of their overtime allegations, the Plaintiffs attempt to rely again on the fact that "no complicated mathematical calculation" of hours worked overtime is needed if their payments were simply never submitted. Compl. ¶ 153. This is true, but the Plaintiffs must allege specific instances in which they actually worked overtime or provide other "substantive content to elevate the FLSA claims above the mere possibility of defendants' liability." Manning, 725 F.3d at 45 ; see also Pruell, 678 F.3d at 14 (reasoning that allegation of work in excess of forty hours per week insufficient because "various forms of 'work' may not be not compensable" under the FLSA); Ramos v. Jose Santiago, Inc., Civ. A. No. 16-3162, 2017 WL 2484176, at *2, 2017 U.S. Dist. LEXIS 89241, at *3-4 (D.P.R. June 8, 2017) (Delgado-Hernández, J.) (disregarding allegations such as that plaintiffs "regularly and consistently worked more than 40 hours per workweek" because they "solely state the obvious").
The Plaintiffs' allegations ("Plaintiffs often worked several consecutive days that exceeded 8 hours," Compl. ¶ 85, "Plaintiffs were required to work off the clock," id., and "were not paid for missed meal periods at double the rate," id. ¶ 86) closely resemble the claims the First Circuit dismissed in Pruell as merely conclusory, see Pruell, 678 F.3d at 13-14 (ruling allegation that the plaintiffs "regularly worked hours over 40 in a week and were not compensated for such time" as "little more than a paraphrase of the statute."). Further, they lack the type of substantive context that rendered overtime allegations in Manning plausible. 725 F.3d at 45-46 (citing specific factual allegations showing that nurses worked, uncompensated, during lunch breaks and before and after shifts on top of forty-hour workweeks). With the Plaintiffs' limited concrete factual allegations regarding overtime work here, the Court granted the Defendants' motions to dismiss counts II and VI for failure to state a claim.
*357 VI. NO PRIVATE RIGHT OF ACTION UNDER PUERTO RICO'S TIME AND MANNER OF PAYMENT LAW
In count IV, the Plaintiffs allege that the J&W Defendants and the Technology Defendants are liable for violations of Puerto Rico's wage and manner of payment requirements pursuant to section 173 of title 29 of the Annotated Laws of Puerto Rico ("section 173"). Compl. ¶¶ 173-81. This section of the Puerto Rican code sets out specific requirements as to the time and manner of payments to employees. See P.R. Laws Ann. tit. 29, §§ 171 - 179. As relevant here, the code requires that the "total amount of wages due to a worker or employee shall be paid in legal tender ... at intervals which shall not exceed fifteen (15) days." Id. § 173.
In its motion for judgment on the pleadings, ECO IQ argued that liability under this section is improper because section 173 of title 29 of the Annotated Laws of Puerto Rico does not create a private cause of action. ECO IQ Mot. 19. The Plaintiffs did not respond to this argument in their opposition to ECO IQ's motion. See generally Pls.' Opp'n Mot. ECO IQ; but see Pls.' Mot. Recons. & Clarification Ct.'s Order Granting Part & Denying Part Defs.' Mots. Dismiss ("Pls.' Mot. Recons.") 15-17, ECF No. 164 (arguing that there is indeed a private right of action under section 173). The Court agrees with ECO IQ's assessment and accordingly dismissed all counts arising under this provision of Puerto Rican law.
The Court looks to federal law for guidance on this question of statutory interpretation. See Rodriguez v. Bennett, 540 F. Supp. 648, 651 (D.P.R. 1982) (Cerezo, J.) (looking to Supreme Court precedent that analyzes when to infer private cause of action in federal statute when determining whether to infer private cause of action without the intervention of the Secretary of Labor for violation of Puerto Rico labor law).
When a statute does not include an express private cause of action, "[t]he judicial task is to interpret the statute ... to determine whether it displays an intent to create not just a private right but also a private remedy." Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (citing Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 15, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) ). "If the statute itself does not 'displa[y] an intent' to create 'a private remedy,' then 'a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.' " Ziglar v. Abbasi, --- U.S. ----, 137 S. Ct. 1843, 1856, 198 L.Ed.2d 290 (2017) (alteration in original) (quoting Alexander, 532 U.S. at 286-87, 121 S.Ct. 1511 ). Moreover, "certain factors cut against finding an implied private cause of action in a given statute, such as the existence of other express enforcement provisions." Allco Renewable Energy Ltd. v. Massachusetts Elec. Co., 875 F.3d 64, 70 (1st Cir. 2017). "Sometimes the suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute ... suggest the contrary." Alexander, 532 U.S. at 290, 121 S.Ct. 1511.
Section 173 and related provisions do not expressly contemplate a private right of action.[18] See generally *358 P.R. Laws Ann. tit. 29, §§ 171 - 179. The Plaintiffs admit that there are no available cases in which the courts of Puerto Rico have adjudicated private suits brought pursuant to section 173. See Pls.' Mot. Recons. 16. The Court looks to other statutory provisions to assess whether there is an implied private cause of action in section 173, but -- as a federal court applying Puerto Rico law -- is reticent to expand the Commonwealth of Puerto Rico's law without a clear indication that the Commonwealth's legislature intended as much. See Boschette v. Bach, 925 F. Supp. 100, 103 (D.P.R. 1996) (Pieras, Jr., J.).
Importantly, the statutory scheme in which section 173 is found envisions a criminal enforcement mechanism, as it makes violation of any of the time and manner of payment provisions a misdemeanor. See P.R. Laws Ann. tit. 29, § 177 ("Violation of any of the provisions §§ 171 - 177 of this title shall constitute a misdemeanor."). This suggests that the provisions' drafters did not intend for the courts to imply a private cause of action. See Allco, 875 F.3d at 70.
The Plaintiffs argue that there are cases in which Puerto Rican courts have recognized an implied right of action in section 174, which is covered by the same misdemeanor enforcement provision as section 173. Pls.' Mot. Recons. 17. The case they cite for this proposition, however, does not make any reference to this statutory scheme; rather, it consists of an analysis of the related issue of whether an employer may intervene to oppose an attachment on a defendant employee's future wages to satisfy a plaintiff's judgment. See Rodríguez Velázquez v. Fontes Cátala, 51 P.R. 648, 650-51 (1937).
In 1961, Puerto Rico enacted a statute that reaffirmed and revised the regulations governing a summary procedure for suits brought by employees seeking compensation for services rendered. See P.R. Laws Ann. tit. 32, §§ 3118 - 3132 ; see also Act No. 10 of Nov. 14, 1917, P.R. Laws Ann. tit. 32, §§ 3101-3113 (repealed 1961); Dorado Beach Corp. v. Superior Court, 92 P.R. 594, 598 & n.3 (1965) (acknowledging that Act No. 2 of October 17, 1961 revised the procedural rules governing claims for unpaid wages). The fact that this statute and its precursor clearly contemplate private suits by employees seeking unpaid wages could suggest that section 173 does imply a private right of action.
Indeed, in Secretary of Labor v. Vélez, the Supreme Court of Puerto Rico reviewed a lower court adjudication of an employee's claim of unpaid wages bought pursuant to the precursor of sections 3118 through 3132's procedures. 86 P.R. 555, 558-59, 564-65 (1962). Sections 271 through 288 of title 29 of the Annotated Laws of Puerto Rico provided the statutory basis for the plaintiff's suit. See id. at 557. Found in the same title (governing labor protections) as section 173, sections 271 through 288 impose general labor rules on employers, including establishing an eight-hour workday and requiring employers pay extra for overtime work. Also, as in section 173, employer violations of the provisions in sections 271 through 288 can beget misdemeanor liability. See P.R. Laws Ann. tit. 29, §§ 287, 290, 292. All this would seem to suggest that the statutory scheme in sections 171 through 177 is like *359 that in sections 271 through 288, and thus that if the Puerto Rico Supreme Court recognized a private cause of action under the latter section, it would find one in the former, too.
This reasoning would prevail were it not for a provision in title 29's section 282 that provides explicitly for a private cause of action for individuals to enforce their rights under sections 271 through 288 pursuant to the procedure established by title 32, sections 3118 through 3132. See P.R. Laws Ann. tit. 29, § 282 ("Any employee who receives a compensation less than that fixed by §§ 271 - 288 ... shall be entitled to recover from his employer, through civil action, the sums unpaid ...."). The Puerto Rico Supreme Court's decision in Vélez buttresses reading section 282 to exclude a private cause of action under section 173, which stipulates no such thing, because the decision references section 173 only to invalidate the employer's potential defense that the employee had received daily meals and lodging. See 86 P.R. at 564-65.
The Plaintiffs suggest that the Court ought interpret sections 171 through 177 to permit a private right of action because section 174 contemplates "an action brought by a laborer against an employer for any amount due him" when it prohibits the employer from bringing a counter claim in such an action. Compl. ¶ 180. The fact that section 174 contemplates lawsuits for unpaid wages does not lead to the ineluctable conclusion that sections 171-177 establish the statutory authorization for such cases, however. In light of section 282's explicit authorization of private civil suits for unpaid wages pursuant to sections 271-288, the Court does not find the Plaintiffs' section 174 argument persuasive. The Court understands section 174 as merely limiting a defendant's permissible responses to an action brought pursuant to section 282.
Concluding on the reasoning above that section 173 does not create a private right of action to impose liability on employers for unpaid wages, this Court granted ECO IQ's motion to dismiss count IV. See Boschette, 925 F. Supp. at 103 ("We may, perhaps, be unadventurous in our interpretation of [state] law, but a plaintiff who seeks out a federal venue ... should anticipate no more." (quoting Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990) )). Moreover, concluding -- as this Court does -- that no such cause of action exists, the Court also dismisses count IV as to all other Defendants, noting that the defect identified could not be cured by amending the complaint. See Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 30-32 (1st Cir. 2000) (recognizing that sua sponte dismissal of a claim without notice is permissible when an amendment could not cure the claim's flaws) (citing Wyatt v. City of Bos., 35 F.3d 13, 15 n.1 (1st Cir. 1994) ).
VII. BREACH OF THE PER DIEM AGREEMENT
Only Guthrie and ECO IQ moved to dismiss this count. Guthrie argues that if he signed the Per Diem Agreement, he did so on behalf of J&W and not in his personal capacity. J&W Mot. 12-13. He thus suggests that the Plaintiffs cannot reach him without piercing the corporate veil and insists that the complaint does not make a sufficient showing to do so. Id. The Plaintiffs posit that their complaint adequately alleges alter ego liability via veil piercing. Pls.' Opp'n Mot. J&W 13-14. ECO IQ suggests that its absence from the Subcontractor Agreement attached to the complaint absolves it from liability. ECO IQ Mot. 22.
The Plaintiffs correctly note that they have pled enough to establish a veil-piercing claim against Guthrie. See, e.g., Compl.
*360 ¶¶ 34-35, 80, 89, 90. "[N]either the Puerto Rican courts nor the Puerto Rican legislature has thoroughly addressed the question of what law must apply to piercing the corporate veil." TC Invs., Corp. v. Becker, 733 F. Supp. 2d 266, 278 (D.P.R. 2010) (Besosa, J.) (quoting Wadsworth, Inc. v. Schwarz-Nin, 951 F. Supp. 314, 320 (D.P.R. 1996) (Pieras, J.)). The parties appear to rely on Puerto Rico law. See J&W Mot. 12 & n.13; see generally Pls.' Opp'n Mot. J&W (neither citing any particular law nor controverting the Defendants' citation to Puerto Rico law).
The Plaintiffs may overcome Puerto Rican law's presumption of corporate separateness where they allege that (1) the owner of a corporation's level of control renders the corporation "a mere shell" of the owner, and (2) "the corporation is being used to sanction fraud, provide injustice, evade obligations, defeat public policy, justify inequity, protect fraud or defend crime." Milan v. Centennial Commc'ns Corp., 500 F. Supp. 2d 14, 26 (D.P.R. 2007) (Gelpí, J.) (citing Fleming v. Toa Alta Dev. Corp., 96 P.R. 234, 237 (1968); Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir. 1980) ; Garcia Colon v. Garcia Rinaldi, Civ. A. No. 01-1571, 2006 WL 3421862, at *6 (D.P.R. Nov. 28, 2006) (Dominguez, J.)). Here, the complaint alleges that Guthrie owns J&W and that he is heavily involved with J&W's day-to-day operations, especially regarding the alleged misconduct, which includes a count of fraud. See, e.g., Compl. ¶¶ 34-35, 60, 80, 89, 90, 220-32; see also Satellite Broad. Cable, Inc. v. Telefonica de Espana, 786 F. Supp. 1089, 1100 (D.P.R.) (allowing complaint against parent company to proceed when it simply alleged that a parent company negotiated a deal then caused its subsidiary to sign it), modified on recons. on other grounds 807 F. Supp. 210 (D.P.R. 1992) (Pérez-Giménez, J.). Consequently, the complaint states a plausible claim for piercing the corporate veil.[19]
ECO IQ protests that the complaint fails to allege that it signed the Subcontractor Agreement. ECO IQ Mot. 21-22 (citing Compl. Ex. A). The complaint does allege, however, that ECO IQ agreed to pay the Plaintiffs a per diem and does not allege that the Subcontractor Agreement is the only basis for ECO IQ's promise to pay. See Compl. ¶¶ 201, 223. ECO IQ cites no authority for the proposition that the Plaintiffs had to produce evidence of the agreement itself. See ECO IQ Mot. 22 (citing no authority). As such, the Plaintiffs plausibly allege that ECO IQ breached an agreement to pay them a per diem.
VIII. BREACH OF RENTAL AGREEMENT
In count IX, the Plaintiffs allege that J&W and the Technology Defendants breached the Equipment Rental Agreement. Compl. ¶¶ 205-14. The Court dismissed this count against all of the Technology Defendants as the Plaintiffs fail to allege plausibly that the Technology Defendants were parties to this agreement.[20]
*361 The Equipment Rental Agreement[21] lists only J&W and the Plaintiffs as parties. See Equipment Rental Agreement. The Complaint nonetheless alleges that the Technology Defendants "manifested an intent to be bound" by the Equipment Rental Agreement. See Compl. ¶ 206. This allegation does not hold water, whether Puerto Rico law or Virginia law (to which the parties agreed in the Equipment Rental Agreement) applies. See Equipment Rental Agreement ¶ 24.
In Puerto Rico, "[t]here is no contract unless ... the consent of the contracting parties" exists. P.R. Laws Ann. tit. 31, § 3391. "Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract." Id. § 3401. Puerto Rico law further requires a "meeting of the minds as to the terms agreed upon." Bianchi-Montaña v. Crucci-Silva, 720 F. Supp. 2d 159, 165 (D.P.R. 2010) (Besosa, J.) (citation omitted). Virginia law is similar; it requires a "meeting of the minds," which in turn "requires a manifestation of mutual assent." Wells v. Weston, 229 Va. 72, 326 S.E.2d 672, 676 (1985).
Here, the Plaintiffs make no effort to show that they agreed with any of the Technology Defendants on the contract's terms. See generally Compl. Instead, they indicate instances in which the Technology Defendants benefitted from the Equipment Rental Agreement, such as through installing "GPS and load tracking devices in Plaintiffs' vehicles." Id. ¶ 82. They do not allege that any of the Technology Defendants signed the Equipment Rental Agreement, that they paid the Plaintiffs under it, or even that the Technology Defendants were aware of it. See id. ¶ 98. As such, they fail to allege that the Technology Defendants were parties to the Equipment Rental Agreement. The Court dismissed this count against all of them for this reason.
IX. UNJUST ENRICHMENT
Guthrie suggests that the Plaintiffs must pierce the corporate veil in order to show his liability for unjust enrichment. J&W Mot. 11. As described above, the Plaintiffs have alleged enough to move forward on a veil-piercing theory. ECO IQ contends that the complaint fails to provide enough facts to make out an unjust enrichment claim against it. ECO IQ Mot. 24-25.
The complaint states a claim for unjust enrichment against ECO IQ:
To prove a claim for unjust enrichment under Puerto Rico law, "[t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause."
Montalvo v. LT's Benjamin Records, Inc., 56 F. Supp. 3d 121, 136 (D.P.R. 2014) (Gelpí, J.) (alteration in original) (quoting Hatton v. Municipality of Ponce, 134 D.P.R. 1001 (1994) ). Here, the Plaintiffs allege that ECO IQ benefitted from their labors on the Project through contract funding and advertising on their trucks. See Compl. ¶¶ 81, 84-90. Notwithstanding these efforts, ECO IQ did not pay the Plaintiffs in full. Id. ¶¶ 93-94. As a result, the complaint establishes a plausible unjust enrichment claim against ECO IQ.
*362 X. FRAUDULENT INDUCEMENT
The Court granted ECO IQ's motion for judgment on the pleadings on the fraudulent inducement claim because the Plaintiffs fail to allege any facts showing that ECO IQ "deliberately induced Plaintiffs to travel to Puerto Rico to work for them and that they promised to pay Plaintiffs for their work and for the lease of their property." ECO IQ Mot. 24-25.
The Plaintiffs allege that the Defendants fraudulently induced them to accept employment. See Compl. ¶ 224 ("Defendants knew or should have known that these representations [about the debris-removal job] were false and made them with the intention that Plaintiffs act upon said representations.").
While there is some evidence that the J&W Defendants induced the Plaintiffs to Puerto Rico for work on the Project, the complaint attempts to bootstrap all the Defendants by stating that they acted "through" Guthrie. See Compl. ¶¶ 222-23, 226, 227. Such an allegation as to ECO IQ is conclusory and without any basis in other facts asserted. As such, the Court granted judgment on the pleadings for ECO IQ on this claim.
XI. CONVERSION
The Court likewise granted ECO IQ's motion for judgment on the pleadings as to the conversion claim as the complaint is bereft of allegations that ECO IQ specifically exercised control over the Plaintiffs' equipment. See generally id. Instead, the complaint offers conclusory allegations such as that "Defendants, and each of them, illegally exercised and assumed authority" over the Plaintiffs' equipment. Id. ¶ 236. These allegations are insufficient to plead conversion.
XII. CONCLUSION
For the reasons set out above, the Court dismissed count II as to Cloud IQ, Mojo, Neilitz, Synergy, Guthrie, and Rivero; count IV as to all of the Defendants; count VI as to Cloud IQ, Mojo, and Synergy; count IX as to ECO IQ, Cloud IQ, Mojo, Migo IQ, Radar_Apps, and Synergy; and counts XI and XII as to ECO IQ. count II remains pending against ECO IQ, Migo IQ, Radar_Apps, Kotthoff, and Leese, as does count VI as to ECO IQ, Migo IQ, and Radar_Apps. Counts XI and XII remain pending against Guthrie (albeit stayed), Cloud IQ, Mojo, Neilitz, Synergy, Rivero, Migo IQ, Radar_Apps, Kotthoff, and Leese. Counts I, III, V, VII, VIII, and X remain alive as to all of the Defendants against whom they were brought (although proceedings are stayed with regards to the claims against the J&W Defendants).
SO ORDERED.

While this Court wrote this memorandum, the Department of Labor issued a Notice of Proposed Rulemaking to revise the standards for evaluating a joint employment relationship in section 791 of chapter 29 of the Code of Federal Regulations. Joint Employer Status under the Fair Labor Standards Act ("Joint Employer Status NPRM"), 84 Fed. Reg. 14,043 (Mar. 29, 2019) (to be codified at 29 C.F.R. § 791). Among other things, the proposed rule would eliminate the "not completely disassociated" factor and make it easier for corporations to escape liability for the minimum-wage violations of their franchisees or contractors. See id. at 14,044 ; see also Noam Scheiber, U.S. Moves to Shield Chains from Claims, N.Y. Times, Apr. 2, 2019, at B3 (reporting that the Joint Employer Status NPRM would narrow when an "upstream" company may be liable under the FLSA when it assists another company that directly supervises or hires and fires employees).

In its proposed rule adopting the Baystate/Bonnette factors as the definitive test of joint employment status, the Department of Labor suggests modifying the first factor from the "ability, power, or reserved contractual right" to hire and fire and employee to the "actual exercise of power" to hire and fire. 84 Fed. Reg. at 14,044.

In this section, the Court refers at times to the Technology Defendants without distinction because some of them seek to escape FLSA liability by asserting that J&W and Guthrie alone employed the Plaintiffs. See Synergy Mot. 5-20; Rivero Mot. 9-10; ECO IQ Mot. 8, 16-17; Cloud IQ Mot. 21-26; Migo IQ Mot. 6, 10. Although the Court refers to the Technology Defendants collectively to distinguish them from J&W and Guthrie, the Court does not entertain a challenge to the FLSA liability of Cloud IQ, Mojo, and Radar_Apps because they do not raise one.

No party here disputes that Puerto Rico is a state for the purposes of the FLSA's jurisdictional reach.

FLSA coverage is an element of an FLSA claim, not a question of subject matter jurisdiction. See Chao, 493 F.3d at 33.

The Defendants do not mount any challenges to the Puerto Rico labor law claims in particular; they rely on their challenges to the Plaintiffs' FLSA claims. See Cloud IQ Mot. 4-8; Rivero Mot. 12-13; ECO IQ Mot. 17-18; see generally Synergy Mot. (arguing only that FLSA does not apply because Synergy is not a joint employer); Migo IQ Mot. (arguing that only J&W should be liable to the Plaintiffs for any of their claims). Thus the Court does not consider whether the Plaintiffs state a claim under Puerto Rico labor law. See Roberts v. USO Council of P.R., 98 TSPR 25, 145 D.P.R. 58 (1998) ("The [FLSA] does not incorporate state labor legislation. The latter may only be applied insofar as it would be more beneficial to the worker ....").

In their complaint, the Plaintiffs assert that section 177 of title 29 of the Annotated Laws of Puerto Rico ("section 177") authorizes employees to obtain unpaid wages, liquidated damages, costs, and attorney fees from an employer that has violated the act's provisions, and suggest that section 177 authorizes an employee to seek such damages in a civil action like their own. Compl. ¶ 175. Section 177 does no such thing; rather, it establishes a criminal penalty for violations of sections 171 to 177. P.R. Laws Ann. tit. 29, § 177. Section 177 does contemplate that an employee can recover unpaid wages and liquidated damages if the employer voluntarily makes such payment within ten days of the salary payment date to avoid the imposition of criminal penalties. Id.

The Court made its ruling on January 8, 2019, ECF No. 160. Guthrie did not seek bankruptcy protection until January 23, 2019, ECF No. 165. It is, therefore, appropriate for this Court to explain its reasoning in this memorandum.

In their motion for reconsideration, the Plaintiffs point out that Migo IQ did not specifically seek dismissal of count IX. See Pls.' Mot. Recons. 17. In its motion to dismiss all of the counts against it, however, Migo IQ did point the Court's attention to the fact that count IX alleges breach of a contract to which none of the Technology Defendants are parties. See Migo IQ Mot. 11.

While there are a series of individual Equipment Rental Agreements between J&W and the individual plaintiffs (or corporate entities created in their names), the Court refers to the Rental Agreement as singular because the Plaintiffs aver that the terms of all of these agreements are substantially similar. Compl. ¶¶ 67-69.